# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| U.S. COMPOSITE PIPE SOUTH, LLC, | CIVIL NO. 12-00538 JMS-KSC |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT, OR FOR PARTIAL SUMMARY JUDGMENT |
| vs. | |
| FRANK COLUCCIO CONSTRUCTION COMPANY, and SAFECO INSURANCE COMPANY OF AMERICA, | |
| Defendants. | |
| FRANK COLUCCIO CONSTRUCTION COMPANY, | |
| Counterclaimant, | |
| vs. | |
| U.S. COMPOSITE PIPE SOUTH, LLC, | |
| Counterclaim Defendant, | |
| and | |
| WESTCHESTER FIRE INSURANCE COMPANY, and CITY AND COUNTY OF HONOLULU, | |
| Additional Counterclaim Defendants. | |

**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR
SUMMARY JUDGMENT, OR FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION

Currently before the court are several Motions for Summary

Judgment, or for Partial Summary Judgment, in this diversity action stemming

from a $37 million sewer construction contract (the "Beachwalk Contract")

between Counterclaim Defendant City and County of Honolulu (the "City") and

Defendant/Counterclaimant Frank Coluccio Construction Company ("FCCC").

At one level, the dispute is relatively simple -- is Plaintiff U.S.

Composite Pipe South, LLC ("Composite Pipe") entitled to full payment from

FCCC for specialized sewage pipe that Composite Pipe supplied for the

Beachwalk Contract, or, on the other hand, is FCCC entitled to damages and to

withhold payment because of problems with the pipe?  But in addressing those

questions, the case becomes highly complex, both procedurally and factually.  The

Motions from all sides raise a variety of issues ranging from contractual

interpretation and civil engineering to possible applications of provisions of

Hawaii's Uniform Commercial Code ("UCC").

After considerable effort reviewing the lengthy evidentiary record,

the court readily concludes that a myriad of genuine issues of material fact exist.

Accordingly, except as to one issue, the Motions are DENIED. The evidence is undisputed, however, that Composite Pipe is entitled at this stage to the second (of three) installment payments for the pipe at issue, and Composite Pipe's Motion is GRANTED to that extent.

## II. BACKGROUND

Before setting forth the basic background, it bears emphasizing that the record contains obvious disputes of fact as to many salient points -- for example, the precise contractual obligations of the parties; the circumstances leading to the change in pipe at issue; whether the pipe met proper standards; whether the pipe was delivered late; responsibility for the July 2012 flooding of the sewage shaft; and whether that inundation caused damage to FCCC's equipment that, in turn, caused foreseeable consequential damages regarding a different sewage construction contract at Ala Moana Beach Park between FCCC and the City.

The parties -- with counsel experienced in commercial and construction litigation -- know that the court cannot resolve disputes of material fact at the summary judgment stage. *See, e.g.*, *McGinest v. GTE Serv. Corp*., 360 F.3d 1103, 1113 n.5 (9th Cir. 2004) ("[I]t is axiomatic that disputes about material facts and credibility determinations must be resolved at trial, not on summary

judgment."). In that sense, it is not helpful for the parties to argue, as they sometimes do here, that opposing testimony is false or not credible. *See, e.g.*, *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1036 (9th Cir. 2005) ("[T]he judge does not weigh disputed evidence with respect to a disputed material fact. Nor does the judge make credibility determinations with respect to statements made in affidavits, answers to interrogatories, admissions, or depositions.") (quoting *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)).

   With this background, the court sets forth the details of the action only as necessary to establish the key disputes of fact, and to make certain rulings of law that might focus further proceedings in this matter (including the non-jury trial currently set to begin on December 9, 2014).

## A. The Beachwalk Contract and Composite Pipe's Complaint

   The June 23, 2009 Beachwalk Contract between the City and FCCC was for construction of a "Beachwalk [Wastewater Pump Station] to Ala Moana Park Sewer: Phase 1 -- Force Main System[.]" Doc. No. 1, Compl. ¶ 7. Among other things, the Beachwalk Contract involved the placement of sewage piping from Waikiki to a station near Ala Moana Park, and required installation of a specialized double-curved section of pipe to be placed under the Ala Wai Canal.

The project was necessitated by a consent decree between the City and the Environmental Protection Agency resulting, at least in part, from a well-publicized sewage failure in 2006.

For this purpose, Composite Pipe provided $3.5 million worth of "Meyer Pipe" (manufactured by a German company, Meyer Rohr + Schacht, which is now insolvent) to FCCC pursuant to a November 13, 2011 Purchase Order (the "Purchase Order") between Composite Pipe and FCCC.[1] (That Purchase Order led to "Change Order No. 4" of the Beachwalk Contract.) Composite Pipe was to be paid in installments by FCCC: fifty percent upon signing of the Purchase Order, twenty five percent upon delivery to the job site, and twenty five percent after installation and pressure testing. *Id.* ¶ 12. Allegedly, Composite Pipe delivered the pipe to FCCC, FCCC installed it, and the City eventually accepted the Beachwalk Contract project after pressure testing. FCCC paid the first installment to Composite Pipe, but has allegedly refused or wrongfully delayed payment of the second and third installments. *Id*. ¶¶ 28, 30.[2]

---

[1] Composite Pipe's surety is Additional Counterclaim Defendant Westchester Fire Insurance Company ("Westchester"). Doc. No. 42, Am. Counterclaim ¶¶ 3, 77. Similarly, FCCC's surety for payment under the Purchase Order is Defendant Safeco Insurance Company of America ("Safeco"). Doc. No. 1, Compl. ¶¶ 18, 19.

[2] The City paid FCCC for the second increment (which has not, in turn, been paid to Composite Pipe), but the City has not paid FCCC (pending this litigation, apparently at the

(continued...)

Composite Pipe filed this action to recover over $1.8 million as payment for those installments with interest, as well as attorneys' fees and costs. *Id.* ¶ 34.

## B.    FCCC's Amended Counterclaim

As part of its defense, FCCC filed an Amended Counterclaim against Composite Pipe, joining the City as an "Additional Counterclaim Defendant" under Federal Rules of Civil Procedure 13(a) and (h).  FCCC contends it need not make the final payments because (1) the pipe did not meet certain specifications and/or was defective; (2) FCCC is entitled to liquidated damages because the pipe was delivered late; and (3) FCCC is entitled to a large offset (or related damages from the City) because of a breach of contract and negligence by Composite Pipe and/or the City.  *See generally* Doc. No. 42, Am. Counterclaim.

The Amended Counterclaim makes detailed allegations about how and why the Meyer Pipe was chosen -- it was selected by the City as a replacement for "Al Watari Pipe" from a Kuwaiti firm that was described, and relied upon, in City bidding documents when FCCC originally bid on the Beachwalk Contract. The Amended Counterclaim alleges some of the specific circumstances (*e.g.*, change orders, negotiations, and communications with the City and its retained

---

[2](...continued)
request of Composite Pipe) for the third increment.  *See* Doc. No. 142-20, FCCC Ex. 15, Franklin Dep. at 116.

managing agent, AECOM Technology Corporation) which FCCC believes establish that the City is responsible for negotiating the November 2011 Purchase Order, and choosing, approving, and/or later accepting the Meyer Pipe.[3]

FCCC alleges that the Meyer Pipe was defective and did not meet engineering specifications set forth in the Purchase Order and/or Beachwalk Contract (including Change Order No. 4). And it describes further problems that arose during and after installation, leading to questions as to who was responsible for those problems and whether FCCC is entitled to consequential or other damages as a result. *See generally id.* at pp. 7-21.

In particular, FCCC alleges that during installation of the pipe, a "catastrophic" failure occurred on or about July 7, 2012, resulting in an inundation and flooding of "the shaft and pipe train." *Id*. ¶ 62. This failure "caused property damage to FCCC's microtunneling boring machine and other equipment, and over

---

[3] For example, FCCC alleges:

> The City unilaterally chose the Meyer Pipe, and then unilaterally chose to be the sole negotiator of the Purchase Order, over the objections of FCCC, and then ordered FCCC to sign the purchase order which the City had negotiated with [Composite Pipe]. The correspondence, change order, and other documentation regarding this City-mandated transaction (including the City's "informal" ordering of the replacement gaskets), all show that the Meyer Pipe was the choice of and is the responsibility of the City.

Doc. No. 42, Am. Counterclaim ¶ 34.

two months of delay for dewatering and repair operations." *Id*. Composite Pipe and the City dispute that there was anything wrong with the Meyer Pipe, and proffer evidence (in turn, disputed by FCCC) that the July 7, 2012 inundation was not caused by any problem with the pipe, but rather was caused by FCCC's own installation errors.

Separately, FCCC alleges that "Meyer Pipe No. 19 . . . was used with an Intermediate Jacking Station and broke during initial coupling on Saturday, September 15, 2012." *Id.* ¶ 68. "The broken pipes caused delays as the broken pipe was removed and the situation analyzed to determine the cause." *Id.* "The damages caused by the delays [to FCCC] were in an amount not less than $119,609.84." *Id.* ¶ 73. The parties dispute whether the cause of this September 15, 2012 breakage was FCCC's installation error (as Composite Pipe and the City contend), or the result of Composite Pipe's inadequate or improper notification or labeling as to the characteristics of different pieces of pipe. *Id.* ¶¶ 70-72.

And FCCC seeks consequential damages resulting from the loss of use of its specialized microtunneling boring machine (or related delay), and in particular, costs related to a separate October 2011 sewage construction contract between FCCC and the City (the "Ala Moana Contract"). *Id.* ¶¶ 78, 116. The theory is that damage to the machine, or delay resulting from the inundation, in

turn affected FCCC in its implementation of the Ala Moana Contract. The City "through oral discussions was aware that FCCC was planning on using the same [microtunneling boring] machine on both [the Beachwalk and Ala Moana] projects, which was why the Ala Moana Bid [by FCCC] was over 25 million dollars below the next lowest bid." Doc. No. 145-1, Don Bergman Decl. ¶ 3.

The Amended Counterclaim consists of five causes of action against Composite Pipe, Westchester, or the City. Count One alleges "breach of contract and breach of warranty" against Composite Pipe as follows:

> 83. FCCC has performed all of its obligations under the Purchase Order.
>
> 84. [Composite Pipe] has breached the Purchase Order by reason of its (a) failure to timely deliver the [Composite Pipe] Meyer Pipe; (b) delivery of pipe that did not conform to the requirements of the Purchase Order; (c) breach of express and implied warranties; and (d) delivery of pipes with defects in material and/or which did not comport with standards of proper workmanship.
>
> 85. FCCC has suffered damages as a direct and proximate cause of [Composite Pipe's] breaches of contract, including but not limited to direct damages and consequential damages from the effect of lost time on the Ala Moana Contract with the City, in an amount to be proved at trial.[4]

---

[4] At the September 29, 2014 hearing, FCCC represented to the court and the other parties

(continued...)

86. FCCC is also entitled to $78,000 in liquidated damages.

Doc. No. 42, Am. Counterclaim at 22.

Count Two asserts a claim against Westchester based on its performance bond to satisfy Composite Pipe's obligations. *Id.* at 23.

Count Three asserts negligence against Composite Pipe and the City as follows:

92. [Composite Pipe] had a duty to provide pipe which met certain standards of care in it manufacture.

93. The City, by warranting the adequacy of the [Composite Pipe] Meyer Pipe, and by inspecting and accepting it, also had a duty of due care.

94. [Composite Pipe] breached its duty by supplying defective pipe.

95. The City breached its duty by accepting and warranting the use of defective pipe.

---

[4](...continued)
that it was not pursuing this allegation as to Composite Pipe, *i.e.*, that it was not seeking "consequential damages from the effect of lost time on the Ala Moana Contract with the City" from Composite Pipe (only from the City). Accordingly, in reliance on that representation, the court considers consequential damages related to the Ala Moana Contract to be sought only as to the City. In any event, in contrast to the City as discussed below, FCCC has pointed to no evidence that could indicate that any such consequential damages regarding the Ala Moana Contract -- which did not involve Composite Pipe -- were reasonably foreseeable to Composite Pipe. *See, e.g., Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 128, 839 P.2d 10, 33 (1992) (holding that consequential damages for breach of contract are recoverable only "as may reasonably be supposed to have been in the contemplation of the parties at the time the contract was entered into.") (quoting *Jones v. Johnson*, 41 Haw. 389, 393 (1956)).

96. As a result of that breach, FCCC suffered property damage to its micro-tunneling boring machine, and other equipment, and other damages, in an amount to be determined at trial, for which [Composite Pipe] and the City are jointly and severally liable.

*Id.* at 24.

Count Four alleges misrepresentation against Composite Pipe as follows:

98. [Composite Pipe] represented that all of the pipes without a steel coupling bell were of the same dimensions, and could be used as a lead pipe for an [intermediate jacking station].

99. This representation was made by or on behalf of persons who either had a financial interest in the transaction or a duty to provide accurate information.

100. FCCC reasonably relied on this representation.

101. This representation was false.

102. As a result of this representation, FCCC has been damaged in an amount to be proved at trial.

*Id.* at 24-25.

Finally, Count Five alleges "breach of contract and implied warranties" against the City. In particular, FCCC lists several implied and express warranties that City allegedly made to FCCC regarding the Meyer Pipe's specifications and performance. *Id.* ¶¶ 104-110. FCCC concludes:

11

As a result of the breaches by the City of its contractual
obligations and its express and implied warranties, the
City is liable to FCCC and FCCC has been damaged in
an amount to be proved at trial, including but not limited
to the following damages:

- Standby Delay from November 11/1/2012 to
  6/15/2012:  $3,435,290.72
- Consequential Acceleration Costs for Ala Moana
  Project:  $4,979,654.01
- Assembly and Installation of Additional IJS:
  $71,548.64
- Purchase of Tunnel Repair Bands:  $84,591.90
- Shaft Inundation (Recovery/Standby) 7/7/2012 to
  9/6/2012:  $2,198,955.34
- Loss Due to Meyer Pipe #19 Broken + Replaced =
  $119,609.84.

*Id.* ¶ 116.

## C.    Procedural Background

Four Motions are pending: (1) FCCC's Motion for Partial Summary
Judgment (regarding breach of contract and payment), Doc. No. 87; (2) Composite
Pipe's Motion for Summary Judgment, Doc. No. 106; (3) FCCC's Motion for
Partial Summary Judgment on the Issue of Plaintiff's Defense to Liquidated
Damages, Doc. No. 94; and (4) the City's Motion for Partial Summary Judgment
on the Issue of Consequential Damages, Doc. No.114.  Additionally, the City filed
a Substantive Joinder to Composite Pipe's Motion, seeking similar relief on behalf

of the City.  Doc. No. 121.[5]

Several of the Motions were originally set for hearing on July 28, 2014, but that hearing was continued at the request of counsel and after initial limited review of the Motions by the court.  *See* Doc. Nos. 117, 119.  (Meanwhile, on July 30, 2014, the court granted FCCC's Motion to Strike the City's affirmative defense of lack of subject matter jurisdiction.  *See* Doc. No. 130.)  The court deemed the pending Motions to be "related motions" under Local Rule 7.9, and Oppositions and Replies were filed on September 8, 2014, and September 15, 2014.  *See* Doc. Nos. 141, 144, 148, 151, 154, 155.  The court held a hearing on September 29, 2014.

///

///

///

---

[5]  The court DENIES FCCC's request to strike the City's Substantive Joinder as being filed late, or in contravention of a court order.  *See* Doc. No. 141, FCCC's Opp'n at 2.  Under Local Rule 7.9, the Substantive Joinder was due "within seven (7) days of the filing of the motion . . . joined in."  Composite Pipe's Motion was filed on July 7, 2014, and the City's Substantive Joinder was thus timely filed on July 14, 2014.  (The City had previously sought to *extend* the July 14, 2014 deadline, but the court denied that request, *see* Doc. No. 120, and FCCC apparently misinterpreted that denial as precluding any substantive joinder at all.)

Under Local Rule 7.9, a substantive joinder "means a joinder based on a memorandum supplementing the motion . . . joined in."  The City's Substantive Joinder "supplement[s] the motion joined in" by raising additional arguments for why the court should grant the City similar relief to what Composite Pipe is seeking.  Because the court otherwise denies the Substantive Joinder, it need not address whether the Substantive Joinder raises issues beyond merely "supplementing" Composite Pipe's Motion.

# III.  STANDARD OF REVIEW

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has carried its burden under Rule 56[(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*."  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere

allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on

which a reasonable fact finder could find for the nonmoving party, and a dispute is

'material' only if it could affect the outcome of the suit under the governing law."

*In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at

248). When considering the evidence on a motion for summary judgment, the

court must draw all reasonable inferences on behalf of the nonmoving party.

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille*

*Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence

of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn

in his favor." (citations omitted)).

## IV. **DISCUSSION**

The Motions and Substantive Joinder raise two general categories of

issues: (1) those addressing the Complaint (*e.g.*, whether Composite Pipe is

entitled to the remaining payments for the Meyer Pipe), and (2) those addressing

the Amended Counterclaim (*e.g.*, whether FCCC is entitled to direct, liquidated, or

consequential damages -- either by way of set-off or separately -- because of the

condition of the pipe). The court addresses the Motions as they relate to those two

general categories.

**A.      Whether Composite Pipe Is Entitled to Remaining Payments from FCCC**

Paragraph 10.1 of the Purchase Order provides that FCCC is to pay

Composite Pipe, "[u]nless otherwise specified," as follows:

> Down payment of 50% of the total value of the order to
> be paid upon receiving the signed purchase order, 25%
> of the total value of the order to be paid upon delivery of
> the pipe on the jobsite (based on signed delivery
> documents), and the remaining 25% to be paid
> immediately after pipe is installed and satisfactorily
> pressure tested (50 psi for one hour).

Doc. No. 103-5, Pl.'s Ex. 1 at 5-6.  FCCC made the first payment of fifty percent;

this action revolves around the second and third payments, which the court

addresses separately (beginning with the third).

**1.      *Questions of Fact Preclude Summary Judgment in Favor of Either Party as to the Third (Or Final) Payment***

FCCC moves for partial summary judgment, Doc. No. 87, asserting

that, as a matter of law, it need not make final payment because the pipe was

defective and did not satisfy the specifications of the Purchase Order, *i.e.*, the pipe

was not "satisfactorily pressure tested (50 psi for one hour)."  Doc. No. 103-5,

Pl.'s Ex. 1 at 6.  On the other hand, Composite Pipe not only disputes that

assertion, but moves for summary judgment on its own behalf, contending that it is

undisputed that it is entitled to full payment.  Doc. No. 106.

FCCC claims that the specifications call for passing a hydrotest "at 50 psi with no pressure drop for one hour" (*i.e.*, no leaks for one hour).  According to post-installation testing, the system did not meet that standard.  *See, e.g.*, Doc. No. 88-1, Tim Pearia Decl. ¶ 8 ("The Meyer Pipe was hydrotested twice on November 10, 2012, and failed to hold pressure of 50 psi."); *id.* ¶ 9 ("The Meyer Pipe was hydrotested again on November 13, 2012, and failed to hold pressure of 50 psi."); *id.* ¶¶ 10, 11 (similar); Doc. No. 88-9, FCCC Ex. 7 (similar); Doc. No. 88-11, FCCC Ex. 9 ("The pipe did not hold the pressure.").  FCCC cites to evidence indicating that the parties intended such a standard when the Meyer Pipe was selected.  *See, e.g.*, Doc. No. 88-5, FCCC Ex. 3 ("25% [a]fter successful in situ hydrostatis pressure test (50 psi w/ zero drip for 1 Hr.)"); Doc. No. 88-6, FCCC Ex. 4 ("Payment Terms are acceptable per K.T.I & TRI. . . .  25% FOB Hawaii; 25% after successful in situ hydrostatic pressure test (50 psi w/zero drop for 1 hour)"); Doc. No. 88-8, FCCC Ex. 6 ("Contractor shall hydrotest the pipe at 50 psi for 1 hour with no allowable pressure drop.").  Accordingly, FCCC seeks partial summary judgment as to Composite Pipe's claim for payment against FCCC.

But there is a dispute of material fact as to whether the pipe was actually required to "hold pressure" with "zero drop for one hour."  Composite

Pipe argues that nothing in the Purchase Order says "zero drop" -- it simply says "50 psi for one hour." Composite Pipe also argues that paragraph 10.1 of the Purchase Order concerns only the timing of payment, and the actual pipe specifications are covered in the Beachwalk Contract, sections of which are incorporated into the Purchase Order. In any event, Composite Pipe points out that the City ultimately *changed* the specifications in the Beachwalk Contract (after the November 2012 hydrostatic testing) to allow for loss of pressure "up to a rate of 0.5 psi every 10 minutes." Doc. No. 103-1, Bezhad Basiri Decl. ¶ 4; Doc. No. 103-18, Pl.'s Ex. 14. Thus, Composite Pipe argues that, even if the pipe did not meet requirements in the Purchase Order, FCCC has not been damaged because the City accepted the final project.

The intent of the parties is disputed, and the language of the Purchase Order is ambiguous. Some evidence indicates that the parties to the Purchase Order (Composite Pipe and FCCC) may indeed have intended the pipe to have no pressure drop for one hour of testing. *See, e.g.*, Doc. No. 88-6, FCCC Ex. 4; Doc. No. 88-8, FCCC Ex. 6. But there is evidence to the contrary. *See, e.g.*, Doc. No. 103-1, Basiri Decl. ¶ 4. And even if the City ultimately changed certain specifications in the Beachwalk Contract, the City is not a party to the Purchase Order -- those specifications may not necessarily control the requirements of the

18

Purchase Order. Further, there is evidence that all parties (including the City) were involved in setting the terms of the Purchase Order. *See, e.g.*, Doc. No. 103-2, Kenneth Thompson Decl. ¶ 7.

Moreover, even if the Beachwalk Contract's original standards control, there is ample evidence that the Meyer Pipe differed in many respects from the Al-Watari Pipe that was originally contemplated by all sides when the Beachwalk Contract was signed in 2009. *See, e.g.*, Doc. No. 142-3, Don Bergman Decl. ¶¶ 6-11. Evidence indicates that FCCC was therefore concerned about the quality of the Meyer Pipe, and documents indicates that FCCC insisted on express warranties from Composite Pipe, and that all parties were involved with discussions about "zero" leakage for one hour. *See, e.g.*, *id*. ¶¶ 15, 16; Doc. No. 142-12, FCCC Ex. 7; Doc. No. 142-13, FCCC Ex. 8.

It is premature to address how FCCC might have been damaged if the pipe did not meet specifications. FCCC claims that "leakage would subject FCCC to potential [future] claims" and thus it "was well within its right to insist that final payment would be contingent on a pipe that did not leak." Doc. No. 141, FCCC's Opp'n at 7.

There is another obvious material question of fact -- why did the system leak? Composite Pipe asserts that any leakage was not due to any defects

in the Meyer Pipe, but the result of FCCC's installation errors. FCCC asserts the opposite. And there is other evidence that the pipe did not leak at all, at least at the factory. *See, e.g.*, Doc. No. 103-2, Thompson Decl. ¶ 11 ("[T]he [Meyer Pipe] and its joints were successfully tested in the factory to hold 50 psi of pressure with no pressure loss, verifying the integrity and quality of the pipe and joints."). A November 23, 2011 letter from the City to FCCC sums up the issue -- the City states to FCCC that "[a]ny leaks or failures resulting from pipe performance and not from the installation of the curved piping will be the responsibility of the pipe manufacturer[.]" Doc. No. 88-7, FCCC's Ex. 5. And given the record before the court (as discussed further below), the cause of the leaks is not a question that can be resolved at summary judgment.[6]

### 2. It Is Undisputed That Composite Pipe Is Entitled to the Second Installment Payment

Although there are questions of fact regarding whether the pipe met specifications, such disputes only justify FCCC withholding the third payment under the terms of the Purchase Order. Contractually, it is undisputed that the

---

[6] Composite Pipe further argues that, even if the pipe was somehow defective, the Purchase Order contains limitation of liability provisions that restrict FCCC's remedies to demanding replacement, and do not allow FCCC to withhold payment. As discussed further below when the court addresses issues regarding the Amended Counterclaim, it is unclear whether the Purchase Order's general limitation provisions apply, where (1) there is substantial evidence indicating that Composite Pipe made more specific express warranties, and (2) certain provisions of Hawaii's UCC may apply.

conditions for the *second* payment have been satisfied. The City has paid FCCC

for that installment, and the pipe was delivered and incorporated into the project.

The Purchase Order clearly provides "25% of the total value of the order to be

paid upon delivery of the pipe on the jobsite (based on signed delivery

documents)." Doc. No. 103-5, Pl.'s Ex. 1 at 6. Indeed, FCCC's own Motion

arguing that it need not pay Composite Pipe is directed only at the third payment --

FCCC asks the court to "determin[e] that *the final 25% payment* on the material

supplied by [Composite Pipe] is not due because Meyer Pipe failed to pass the

hydrostatic test requirement of holding 50 pounds per square inch of pressure,

without a drop, for one hour." Doc. No. 87, FCCC's Mot. at 2 (emphasis added).

    FCCC argues that it might still be entitled to damages from

Composite Pipe. But even assuming FCCC eventually prevails on its Amended

Counterclaim as to Composite Pipe, or assuming that Composite Pipe must pay

some liquidated damages for late delivery, this does not mean FCCC is necessarily

entitled to withhold payment to Composite Pipe -- especially where it is now

undisputed that such a payment was due. It only means Composite Pipe might be

separately liable for damages later.[7]

---

    [7] FCCC cites to Hawaii Revised Statutes ("HRS") § 490:2-717, a provision of Hawaii's
UCC, which provides:

(continued...)

Accordingly, the court GRANTS in part Composite Pipe's Motion for Summary Judgment. Pursuant to ¶ 10.1 of the Purchase Order's General Terms and Conditions, the second payment of $899,159 is due to Composite Pipe from FCCC. *See* Doc. No. 103-5, Pl.'s Ex. 1 at 6; Doc. No. 103-2, Thompson Decl. ¶ 13 (indicating the amount of the second payment is $899,159).

The Purchase Order also calls for interest if amounts are not timely paid. In particular, paragraph 10.4 of its General Terms and Conditions provides:

> Failure to pay Full Price when due. If the Full Invoice Price is not paid within the agreed period from due date, a Late Payment Finance Charge equal to one percent % per month (equivalent to an annual percentage rate of 12% per annum) on entire past due balance will be paid by Buyer. Interest shall begin to accrue sixty (60) days

---

[7](...continued)
> The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract.

FCCC, however, has not proffered evidence (much less argued the point) that meets its initial burden to demonstrate that it fulfilled the notification requirement, nor has it established that this section otherwise applies to the *second* payment. *Cf. Quaker Alloy Casting Co. v. Gulfco Indus., Inc.*, 686 F. Supp. 1319, 1344 (N.D. Ill. 1988) (addressing whether an unpaid amount was "still due" under UCC § 2-717, and suggesting that "a reactive counterclaim after suit was filed" is insufficient "notice" of a buyer's "intention to . . . deduct all or any part of the damages resulting from any breach of the contract"). Although there might be some basis for § 490:2-717's application as to the *final* payment, FCCC has not pointed to any evidence indicating that it would have had a basis to invoke that section at the time the pipe was delivered (when the second payment became due). "Section 2-717 is not a general set-off provision permitting a buyer of goods to adjust its continuing contract obligations according to the equities perceived by the buyer." *ITV Direct, Inc. v. Healthy Solutions, LLC*, 379 F. Supp. 2d 130, 133 (D. Mass. 2005) (internal quotation omitted).

from date of delivery.

Doc. No. 103-5, Pl.'s Ex. 1 at 6. Applying this provision, Composite Pipe submits an unopposed declaration indicating that interest began accruing on September 1, 2012, which is "[sixty] days after delivery of all parts of the order." Doc. No. 103-2, Thompson Decl. ¶ 13. It computes the total principle and interest owed for the second installment payment as of July 31, 2014 as $1,105,793. *Id.*[8] These figures are undisputed, and are consistent with the court's calculations using the same figures (principle of $899,159 at an interest rate of twelve percent per year). Accordingly, the court awards interest at a corresponding per diem interest rate ($899,159 x 0.12/365, or approximately $295.61 per day).

## B. Questions of Fact Prevent Summary Judgment as to the Amended Counterclaim

FCCC's Amended Counterclaim seeks damages from Composite Pipe and the City based on the condition of (and selection or approval of) the Meyer Pipe. Composite Pipe moves for summary judgment as to those claims, contending that it is undisputed that FCCC's damages (*e.g.*, damages to FCCC's microtunneling machine incurred in the July 2012 inundation, and related

---

[8] This figure of $1,105,793 corresponds to a per diem rate of slightly over $295.61 ($899,159 x 0.12/365) for 699 days from September 1, 2012 until July 31, 2014. Given that rate, it consists of principle of $899,159 and interest of $206,634. The court will proceed with that per diem interest rate ($899,159 x 0.12/365, or approximately $295.61 per day).

consequential damages) were caused by FCCC's installation errors, and were not the result of any defects in the pipe. Composite Pipe also asserts that relief is barred by contractual limitation of liability provisions in the Purchase Order. The City's Substantive Joinder seeks the same relief as to the City, contending that it is undisputed that it has no responsibility, either factually or based on limitation provisions in the Beachwalk Contract.[9]

### 1.    *The Cause of the July 2012 Inundation Is Disputed*

Without detailing all the evidence, there are obvious disputes of fact as to the cause of the inundation and resulting damage to FCCC's equipment. For example, Composite Pipe proffers evidence that FCCC failed to properly install the shaft seal, contending it failed to follow "shop drawings" and "reversed the 1/2" and 3/4" seals so that the thinner and longer seal was directly exposed to the [microtunneling machine] when it was launched rather than being protected by the thicker 3/4" seal." Doc. No. 107-3, William Harrel Decl. ¶¶ 2, 3. It also asserts that FCCC "failed to launch its [microtunneling machine] in the center of the seal opening," *id.* ¶ 3, and "did not properly adjust the slide plates to reinforce the ring seal at [the] first IJS installation[.]" *Id.* ¶ 12. Likewise, the City's Substantive

---

[9] In a similar Motion discussed below, the City also asserts it cannot be liable for consequential damages based on contractual and statutory provisions limiting remedies.

Joinder argues that -- even if it had some duty of inspection, or was responsible

initially for choosing the Meyer Pipe -- FCCC had ultimate responsibility for

installation, and it did so incorrectly. *See, e.g.*, Doc. No. 122-1, William Wanner

Decl. ¶¶ 11, 13, 16 ("[T]he two seal gaskets were installed reversed from the

approved shop drawing and . . . this was a significant contributing factor to the

failure of the seal[.]").[10]

---

[10] The City also argues that FCCC was not relieved of its ultimate obligations in the Beachwalk Contract. *See* Doc. No. 122-7, City's Ex. 6 at 22 (General Conditions § 4.6(c), providing: "The presence or absence of an inspector shall not result in the waiver of any requirements of the contract[.]"); Doc. No. 122-3, City's Ex. 2 at 5 (General Condition § 107(L), providing: "The action of implementing or not implementing a specific recommendation does not relieve the Contractor of the sole liability and/or responsibility of the construction and operation of the project."); Doc. No. 122-6, City's Ex. 5 at 2 (requiring FCCC "to collaborate with the pipe manufacturer to make sure the jacking pipe and intermediate jacking stations are compatible with [FCCC's] microtunneling machine and system operation").

FCCC responds, however, by claiming that specifications referred to in the Purchase Order make the City responsible for inspection and acceptance of the pipe. *See* Doc. No. 122-6, City's Ex. 5 at 11 (Revised Specification 406 providing "Pipe Acceptance and Rejection. . . . [O]nly pipe marked by the Officer-in-Charge [*i.e.*, the City] after delivery to the job site shall be used in the work. The quality of materials, the manufacturing process, and the finished pipe shall be subject to inspection and approval by the Officer-in-Charge."). FCCC also points to a specific clause in a revised Meyer Pipe specification that it claims excuses it from full performance if there is "a problem with the pipe." In particular, the revised specification states:

> The requirement of this specification section is that [FCCC] is responsible to not exceed 650 tons of jacking force on the pipe and to install on line and grade *unless unable to do so due to differing site conditions or a problem with the pipe*. [FCCC] is expected to collaborate with the pipe manufacturer to make sure the jacking pipe and intermediate jacking stations are compatible with [FCCC's] microtunneling machine and system operation.

Doc. No. 145-3, FCCC's Ex. 2 at 2 (emphasis added); *see also* Doc. No. 142-11, FCCC's Ex. 6 at 2. The parties dispute the meaning of this provision -- it could concern only the amount of

(continued...)

But FCCC disputes all of these assertions. *See, e.g.*, Doc. No. 142-1, Timothy Coss Decl. ¶ 7 ("Exhibit 8 is not a shop drawing . . . [i]t is simply an illustration, designed to provide some assistance to the contractor."); *id.* ¶ 8 ("The assertion that FCCC 'reversed' the seal, and thereby improperly installed it, is false"); *id.* ¶ 10 ("It is my opinion, which I have shared with FCCC, that placing the 1/2 inch seal in front of the 3/4 inch seal is most often the better arrangement."); *id.* ¶ 12 ("[I]t is common to launch the machine 'high.' . . . . [I]t is well within industry standards and the discretion to be exercised by an experienced micro-tunneling contractor."); *id.* ¶ 14 ("[T]he slide plates should not be adjusted to a tight tolerance, particularly when the machine is launched."). Instead, FCCC asserts that the Meyer Pipe did not meet specifications, was defective, and caused or contributed to the July 12, 2012 inundation. *See, e.g.*, *id.* ¶ 17 ("I viewed the Meyer Pipe. I saw sharp protrusions and rough edges . . . . the Meyer Pipe was not of good quality, and the sharp protrusions and rough edges in particular were well below the standard of care that would be expected in producing a quality jacking pipe."). *See also* Doc. No. 142-3, Don Bergman Decl.

---

[10](...continued)
jacking force required (not to exceed 650 tons) or it could also relieve FCCC of "installing on line and grade" due to "a problem with the pipe." These are all questions of fact not susceptible of resolution at this summary judgment stage.

¶¶ 7-12 (detailing alleged failures of the pipe);  *id*. ¶ 13 ("[T]he inundation occurred when the compromised seal could not hold pressure when the smaller diameter of the Meyer [Pipe] passed through the seal.  The Meyer Pipe was out of tolerances by over one inch in both the case of the pipe and the IJS stations."); Doc. No. 107-20, Pl.'s Ex. 16 at 6 (Wanner dep. at 50) ("The Meyer pipe does not meet that ASTM [Specification 406] to the letter.").  Doc. No. 122-1, Wanner Decl. ¶¶ 11, 13, 14, 15.

Although both sides challenge the credentials or credibility of witnesses, the court cannot resolve such disputes at summary judgment.  *See, e.g.*, *McGinest*, 360 F.3d at 1113 n.5.  In short, genuine disputes of material fact prevent summary judgment on this question.

## 2.    *Limitation Provisions in the Purchase Order Are Ambiguous*

Composite Pipe further argues that, even if the pipe was somehow defective, the Purchase Order limits liability, disclaims consequential damages, and restricts FCCC to demanding the pipe's replacement.  Specifically, Composite Pipe points to ¶¶ 8.1 and 8.5 of the Purchase Order, which provide:

> 8.1  Seller assumes no responsibility for work done or expense incurred by the Buyer or others in connection with defective pipe or goods sold under this Agreement and repairs or replacement due to defective pipe.
> . . . .

8.5  If the product is found to be defective, the product would be replaced under the manufacturer's warranty. . . . The manufacturer insists on the ability to replace the pipe to provide a continued warranty.  The manufacturer will already have all the tooling and necessary means to rapidly create the pipe and ship it to the site more quickly than any other manufacturer of the same pipe.

Doc. No. 103-5, Pl.'s Ex. 1 at 5.

FCCC responds by pointing to substantial evidence that Composite Pipe made explicit (and implied) warranties, citing to provisions of Hawaii's UCC that allow it to seek damages.[11]  *See, e.g.*, Doc. Nos. 142-12 & 142-13, FCCC's Exs. 7, 8 (letters from Composite Pipe regarding express warranties); Doc. No. 88-4, FCCC Ex. 2 (August 4, 2011 email from FCCC stating "the owner is adamant about the inclusion of the entirety of their requirements regarding warranty/liability"); Doc. No. 88-5, FCCC's Ex. 3 (August 11, 2011 email setting forth meeting agenda item "Limitation of Warranty - Remove exclusion of Consequential Damages and Labor Incidental to Repair Defective Material or Workmanship"); Doc. No. 88-6, FCCC's Ex. 4 (summary of discussion items including "Limitation of Warranty").  *See also* Doc. No. 103-5, Pl.'s Ex. 1,

---

[11]  FCCC contends that the UCC applies because the Purchase Order "reserved its rights to all damages allowed by law, equity and contract."  Doc. No. 141, FCCC's Opp'n at 10 (citing to ¶ 6 of the Purchase Order's General Terms and Conditions, proving "Compliance with Law. Seller represents that the goods covered by this order were and/or are not produced, sold or priced in violation of any federal, state or local law"); Doc. No. 103-5, FCCC's Ex. 1 at 2; Doc. No. 95-3, FCCC's Ex. 3 at 2.

Purchase Order ¶¶ 7.1, 7.2, 7.4 (express warranties to comply with specifications 402 and 406).

At minimum, these specific warranties create a question of fact as to whether they could override the more general terms (¶¶ 8.1 and 8.5) of the Purchase Order. *See, e.g.*, *Kaiser Hawaii Kai Dev. Co. v. Murray*, 49 Haw. 214, 227-28, 412 P.2d 925, 932 (1966) ("[I]n case of inconsistency between general and specific provisions, the specific controls the general[.]"); Restatement (Second) of Contracts § 203 (1981) ("In the interpretation of a promise or agreement or a term thereof, . . . specific terms and exact terms are given greater weight than general language."); *Israel v. Chabra*, 906 N.E.2d 374, 380 n.3 (N.Y. App. 2009) ("The better and apparent majority rule for resolving irreconcilable differences between contract clauses is to enforce the clause relatively more important or principal to the contract. This rule is tempered by the corollary that the more specific clause controls the more general.") (quoting 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 32:15 at 507-10 (4th ed. 1999 & Supp. 2010)).

In this regard, FCCC relies on ¶ 8.2 of the Purchase Order, which -- perhaps inconsistently with ¶¶ 8.1 and 8.5 -- provides that "Seller assumes no liability for any special or consequential damages, *other than what is expressly*

*stated in the manufacturer's warranty*."  Doc. No. 103-5, Pl.'s Ex. 1 at 5 (emphasis added).  This paragraph was specifically negotiated.  According to FCCC, this language differs from industry standard, and from Composite Pipe's initially-proposed contractual language.  *See* Doc. No. 142-3, Don Bergman Decl. ¶ 20; Doc. No. 142-15, FCCC's Ex. 10 at 3 ¶ 8.2.  And this negotiated language suggests that "special and consequential damages" have been preserved to the extent "expressly stated in the manufacturer's warranty."

### 3. *Questions of Fact Remain as to "Meyer Pipe No. 19"*

Both Composite Pipe and the City move for summary judgment as to FCCC's claim for damages in its Amended Counterclaim regarding "Meyer Pipe No. 19."  FCCC's claim arises from a September 15, 2012 incident in which pipe "broke during initial coupling" with an intermediate jacking station ("IJS"), and "caused delays as the broken pipe was removed and the situation analyzed to determine the cause."  Doc. No. 42, Am. Counterclaim ¶ 68.  FCCC claims at least $119,609.84 in damages for "Loss Due to Meyer Pipe #19 Broken + Replaced."  *Id.* ¶ 116.

Again, disputes of fact preclude entry of summary judgment.  Composite Pipe and the City contend that any damages resulting from the September 15, 2012 incident are solely FCCC's responsibility -- FCCC simply

attempted to install the wrong piece of pipe (which had the wrong dimensions to fit properly onto the IJS), and an experienced sewage construction contractor like FCCC should have known which piece of pipe to install. Ultimately, however, even if these arguments make complete sense and may well carry the day at trial, FCCC has proffered enough evidence to demonstrate a triable issue at this summary judgment stage.

In particular, Tim Pearia, FCCC's project manager for the Beachwalk Contract, testifies that Composite Pipe advised and confirmed to FCCC in an email that "any of the pipes without a steel coupling bell could be used as a lead pipe." Doc. No. 142-4, Pearia Decl. ¶ 8. Under the contract's specifications "the Meyer supplied Intermediate Jacking Stations were supposed to be the same outside dimension as the jacking pipe," *id*. ¶ 7, but in actuality, the IJS did not have exact same dimensions as at least some of the pipe. FCCC's theory is that Composite Pipe did not properly indicate that some pipe "was not suitable for installation as the lead IJS pipe." *Id.* ¶ 11. That is, Composite Pipe failed to inform FCCC that "Pipe 19 was too large to be used as a lead pipe to the IJS[.]" *Id*. ¶ 12. Only after an after-the-fact investigation did FCCC discover that "there were four special pipe numbers that were to be used for the lead IJS pipes." *Id*. ¶ 14. (In contrast, Composite Pipe points out that the proper pipes were shipped

and stored separately, and were marked in some manner with green paint.  *See*

Doc. No. 107-3, Harrel Decl. ¶ 15).

Composite Pipe argues that a multimillion dollar company specializing in large sewage construction projects could not be misled by an email from a marketing representative, and thus would not continue to apply higher and higher jacking force when installing a lead pipe when the pipe did not fit.  Maybe so.  But drawing such a conclusion at the summary judgment stage would involve an inappropriate credibility determination.  Construing FCCC's evidence in its favor, the court concludes that a material dispute of fact exists.  *See, e.g.*, *Posey*, 546 F.3d at 1126 ("[T]he evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor.") (citations omitted).

### 4.    *Questions of Fact Remain as to Liquidated Damages*

Section 1.1 of the Purchase Order's General Terms and Conditions, regarding "delivery," provides in part:  "Shipment to be based upon the attached schedule. . . .  Seller shall be liable to the Buyer for liquidated damages of $1,000 per calendar day for late delivery[.]"  Doc. No. 95-3, FCCC's Ex. 1 at 3.

FCCC seeks $78,000 in liquidated damages from FCCC, asserting that all sections of the pipe were to be delivered by April 24, 2012, but delivery was not complete until July 11, 2012 (or 78 days late).  Doc. No. 95-1, Pearia

Decl. ¶¶ 5-6. Composite Pipe has asserted to FCCC as a defense that the delivery date was modified by a change order involving the City regarding additional pipe. In response, FCCC denies that there was such an extension, and it moves for partial summary judgment as to this limited issue. Doc. No. 94. That is, it seeks a determination that Composite Pipe "has no basis for defending against FCCC's claim for liquidated damages based on the assertion that the delivery date for the Purchase Order at issue was modified by a Change Order." *Id.* at 2.[12] To this end, FCCC submits evidence that the Purchase Order was never officially amended by a Change Order, that FCCC was never asked by the City to change the delivery schedule, and that FCCC never agreed to change the delivery schedule. *See* Doc. No. 95-1, Pearia Decl. ¶¶ 7-13, 16-17.

Composite Pipe, however, disputes FCCC's assertions by offering conflicting evidence. In particular, Composite Pipe's representative, Bezhad Basiri, declares that a change order regarding additional pipe "was negotiated in a telephone conference between myself, representatives of [the City], and FCCC." Doc. No. 105-1, Basiri Decl. ¶ 7. He contends that this "would delay completion

---

[12] The Motion does not seek at this stage to adjudicate the entitlement to, or the amount of, any liquidated damages -- it only seeks to narrow issues for trial. FCCC reasons that "[b]y conclusively adjudicating at this time [Composite Pipe's] claim that there was a Change Order which altered the terms of the Purchase Order, the Court can simplify the issues for trial, and assist the parties in resolving this dispute." Doc. No. 94-1, FCCC's Mem. in Supp. at 7.

and shipping of the entire order from Germany. . . .  We accordingly negotiated

and agreed to an extension of time of the Purchase Order delivery requirements[.]"

*Id.*  He states that he "was advised by email from [the City] that the Change Order

was agreed and that the City would take care of getting FCCC's signature on it, so

we proceeded in reliance on it."  *Id*. ¶ 8.  (He also attests to other reasons that

delivery may have been excused, such as labor strikes at the Panama Canal, that

Composite Pipe claims can extend the delivery date under a *force majeure* clause

in the Purchase Order.  *Id.* ¶ 9.).

FCCC conceded at the September 29, 2014 hearing that a genuine

issue of material fact exists as to liquidated damages, given the Basiri Declaration

(which FCCC claims is false).  Accordingly, FCCC's Motion is DENIED as to

liquidated damages.

> **5.**  ***Questions of Fact Remain as to Claims Against the City for Consequential Damages***

Last, the City moves for summary judgment on FCCC's claims for

consequential damages against the City.  Doc. No. 114.  The Motion is directed

only at Count Five of the Amended Counterclaim, which asserts a breach of the

Beachwalk Contract and/or breach of implied warranties.  That is, the City does

not move as to Count Three -- which alleges negligence against the City and

Composite Pipe -- and the Motion only asserts that FCCC is not entitled to seek

consequential damages (it does not otherwise seek judgment as to Count Five).[13]

Specifically, the City's Motion contends that:

> The undisputed facts show that as a matter of law, FCCC is not entitled to recovery of any consequential damages relating to the increased costs on the Ala Moana Project because (1) the Hawaii Public Procurement Code, which provides the exclusive remedies available to a Contractor in a breach of Contract action against the City, does not allow the recovery of consequential damages, (2) the express terms of the Beachwalk Contract do not allow for the recovery of consequential damages, and (3) the alleged consequential damages were not in the contemplation of the parties at the time the Beachwalk Contract was executed.

Doc. No. 114-1, City's Mot. at 3.

---

[13] In its Opposition, FCCC argues, among other grounds, that its Amended Counterclaim sounds in negligence (to which any restrictions in the Procurement Code, or in the Beachwalk Contract do not apply). To this, the City's Reply argues that Hawaii does not recognize a "negligent breach of contract" (*see Francis v. Lee Enters., Inc.*, 89 Haw. 234, 239, 971 P.2d 707, 712 (1999)), and attempts to raise the "economic loss doctrine." *See, e.g.*, *Leis Family Ltd. P'ship v. Silversword Eng'g*, 126 Haw. 532, 538, 273 P.3d 1218, 1224 (Haw. App. 2012) ("*Newtown Meadows*, although a construction case not involving design professionals, clearly stands for the proposition that the economic loss doctrine bars the recovery of purely economic losses, even in the absence of privity of contract, so long as 'allowing such recovery would blur the distinction between contract and tort law.'") (quoting *Ass'n of Apartment Owners of Newtown Meadows v. Venture 15*, 115 Haw. 232, 292, 167 P.3d 225, 285 (2007)). The City has not, however, moved for summary judgment as to Count Three (negligence), and it is inappropriate for the court to address its validity based on a Reply memorandum. Although the doctrine can bar consequential damages, *Burlington Ins. Co. v. United Coatings Mfg. Co.*, 518 F. Supp. 2d 1241, 1254 (D. Haw. 2007), "[a]n exception to the rule exists when the finished product causes damage to 'other property.'" *Keahole Point Fish LLC v. Skretting Canada Inc.*, 971 F. Supp. 2d 1017, 1030 (D. Haw. 2013) (citing *Kawamata Farms, Inc. v. United Agric. Prods.*, 86 Haw. 214, 254, 948 P.2d 1055, 1095 (1997)). Accordingly, the court will not address Count Three further, and leaves such issues for trial.

### a. *Foreseeability of consequential damages*

The City argues that consequential damages related to the Ala Moana Contract were not foreseeable -- and it relies wholly on a statement of law that consequential damages for breach of contract are recoverable only "as may reasonably be supposed to have been in the contemplation of the parties *at the time the contract was entered into.*"  *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 128, 839 P.2d 10, 33 (1992) (quoting *Jones v. Johnson*, 41 Haw. 389, 393 (1956)) (emphasis added).  Because the Ala Moana Contract was -- at best -- still out for bid when the Beachwalk Contract was signed in 2009, the City contends that any consequential damage related to the Ala Moana Contract that results from any breach by the City of the Beachwalk Contract (*e.g.*, from loss of used of the microtunneling machine) could not have been contemplated.  Such damages were not foreseeable.

But this entire action arises out of the selection and condition of the Meyer Pipe, which also was not contemplated in 2009 when the Beachwalk Contract was signed.  Likewise, the Amended Counterclaim concerns the Meyer Pipe and events that occurred upon installation and after.  The eventual "Change Order No. 4" regarding the Meyer Pipe (or the Purchase Order) are the agreements at issue for purposes of whether selection of, or defects with, the Meyer Pipe could

have caused foreseeable consequential damages. And the evidence indicates that the Ala Moana Contract was executed on October 25, 2011, while the Purchase Order was signed on November 13, 2011 (and the corresponding "Change Order No. 4" for the Beachwalk Contract was fully executed on January 30, 2012) -- both operative dates being *after* the Ala Moana Contract. *See* Doc. No. 145-1, Bergman Decl. ¶ 3; Doc. No. 145-2, FCCC's Ex. 1 at 4 ("[Beachwalk] Contract Change Order No. 4," last executed on January 30, 2012).

Given these dates, questions of fact remain as to whether consequential damages were reasonably foreseeable. FCCC proffers evidence of a plausible -- if not weak -- theory that the City could have foreseen that problems with the Meyer Pipe could result in larger problems with the Beachwalk Contract and affect FCCC's implementation of the Ala Moana Contract. *See* Doc. No. 145-1, Bergman Decl. ¶ 2 ("FCCC has a long history of performing work for the City, and of moving equipment from one completed job to the next. The City is well aware of this history."); *id.* ¶ 3 ("The Ala Moana Contract was executed on October 25, 2011. At that time, the City through oral discussions was aware that FCCC was planning on using the same machine on both projects, which was why the Ala Moana Bid was over 25 million dollars below the next lowest bid.").

### b. *Procurement code and contractual provisions are ambiguous*

The City argues that the state procurement code provides the exclusive remedy for "contract controversies," and that it (and similar provisions of the Beachwalk Contract) do not allow for consequential damages.

HRS § 103D-704 provides, in pertinent part, that "[t]he procedures and remedies provided for in this part, and the rules adopted by the policy board, shall be the exclusive means available for persons aggrieved in connection with . . . a contract controversy[.]"  In turn, Hawaii Administrative Rule ("HAR") § 3-125-7 provides:

> (4)  Cost adjustment.  *If the performance of all or part of the work is suspended for reasons beyond the control of the Contractor* [FCCC], an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by such suspension, and the contract modified in writing accordingly.
>
> However, no adjustment under this section shall be made for any suspension:
>> (A)  To the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor; or
>> (B)  For which an adjustment is provided for or excluded under any other provision of this contract.

*Id.* (emphasis added).  Similarly, Section 8.1(d) of the "General Conditions"

incorporated into the Beachwalk Contract,[14] provides:

> 8.1  Suspension of work . . . .
> . . . .
> (d)  Cost adjustment. *If the performance of all or part of the work is suspended for reasons beyond the control of the Contractor*, an adjustment shall be made for any increase cost of performance of the contract (excluding profit) necessarily caused by such suspension, and the contract modified in writing accordingly.
>
> However, no adjustment under this section shall be made for any suspension:
> > (1)  To the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor; or
> > (2)  For which an adjustment is provided for or excluded under any other provision of the contract.

Doc. No. 115-7, City's Ex. F at 47 (emphasis added).

FCCC argues, however, that its alleged consequential damages do not involve whether "the performance of all or part of the work is suspended for reasons beyond the control of the Contractor" and do not involve a "suspension of work."  Instead, it argues that it seeks consequential damages that arise from "physical damages" to its microtunneling machine, which are not suspension or "delay" damages.  And it contends that the statutory and contractual language does

---

[14]  *See* Doc. No. 115-2, City's Ex. A at 2; Doc. No. 115-5, City's Ex. D, Frank Coluccio Dep. at 97.

39

not actually bar consequential damages -- there is no unambiguous exclusion of such damages.

Material disputes of fact remain as to the applicability of HAR § 3-125-7 and § 8.1 of the Beachwalk Contract. Although the sections no doubt apply to this dispute, the actual application of the language (which is ambiguous) is unclear. The parties (the City in particular) have not explained how the language applies to the dispute at hand. It is thus inappropriate to grant judgment in favor of the City at this stage of the proceedings, and on the current evidentiary record.

## V. <u>CONCLUSION</u>

For the foregoing reasons, the Motions and Substantive Joinder (Doc. Nos. 87, 94, 106, 114, and 121) are DENIED, except for Composite Pipe's claim that it is entitled to the second installment payment (25 percent of the purchase price, or $899,159.00), plus interest at a rate of twelve percent per annum. To that

///

///

///

///

///

///

extent only, the court GRANTS Composite Pipe's Motion for Summary Judgment in part.  Doc. No. 106.  All other issues remain for trial.

IT IS SO ORDERED.

DATED, Honolulu, Hawaii:  October 7, 2014.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*U.S. Composite Pipe S., LLC v. Frank Coluccio Constr. Co., et al.*, Civ. No. 12-00538 JMS-KSC, Order Granting in Part and Denying in Part Motions for Summary Judgment, or for Partial Summary Judgment