IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| U.S. COMPOSITE PIPE SOUTH, LLC, | ) | Civ. No. 12-00538 BMK |
| | ) | |
| | ) | **AMENDED FINDINGS OF** |
| Plaintiff, | ) | **FACT AND** |
| | ) | **CONCLUSIONS OF LAW** |
| vs. | ) | |
| | ) | |
| FRANK COLUCCIO | ) | |
| CONSTRUCTION COMPANY, and | ) | |
| SAFECO INSURANCE COMPANY | ) | |
| OF AMERICA, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| FRANK COLUCCIO | ) | |
| CONSTRUCTION COMPANY, | ) | |
| | ) | |
| Counterclaimant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| U.S. COMPOSITE PIPE SOUTH, | ) | |
| LLC, | ) | |
| | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WESTCHESTER FIRE | ) | |
| INSURANCE COMPANY, and | ) | |
| CITY AND COUNTY OF | ) | |
| HONOLULU, | ) | |
| | ) | |
| Additional Counterclaim | ) | |
| Defendants. | ) | |
| _____ | ) | |

1

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

U.S. Composite Pipe South, LLC ("USCPS") filed this action against Frank Coluccio Construction Company, Inc. ("FCCC") and Safeco Insurance Company of America ("Safeco") to recover payment under a Purchase Order between USCPS and FCCC, stemming from a $37 million sewer construction contract between FCCC and the City and County of Honolulu ("City").  FCCC counterclaims against USCPS and Westchester Fire Insurance Company ("Westchester") seeking damages under the Purchase Order and in tort.

This Court has original jurisdiction pursuant to 28 U.S.C. § 1332, and venue is proper pursuant to 28 U.S.C. § 1391(b)(2).  Having heard and carefully weighed all of the evidence and testimony presented at a nine-day bench trial, having observed the demeanor of the witnesses and evaluated their credibility and candor, having heard the arguments of counsel and considered the memoranda submitted, and pursuant to Federal Rules of Civil Procedure ("FRCP") Rule 52(a)(1), the Court makes the following findings of fact and conclusions of law.  Where appropriate, findings of fact shall operate as conclusions of law, and conclusions of law shall operate as findings of fact.

## I.      Findings of Fact

### A.      The Beachwalk Project

FCCC and the City entered into a contract on June 23, 2009, for the

construction of a "Beachwalk [Wastewater Pump Station] to Ala Moana Park

Sewer: Phase I – Force Main System[,] Contract, No.: CT-DDC-0900444 Job. No.

W-18-07" (hereinafter "Beachwalk Project").  The Beachwalk Project was

necessitated by a consent decree between the City and the United States

Environmental Protection Agency resulting, at least in part, from a well-publicized

sewage failure in 2006.  With a bid of $37 million, approximately $13 million

lower than the next lowest bid, FCCC was the successful low bidder and was

selected by the City to serve as general contractor for the Beachwalk Project.

Among other things, the Beachwalk Project involved the placement of

sewage piping from Waikiki to a station near Ala Moana Park, and required

installation, by means of microtunneling, of a new sewer force-main line consisting

of five sections, or drives, of sewer pipe.  Four of the drives were straight; the fifth

drive, which is the subject of this lawsuit, is a specialized double-curved section of

pipe placed under the Ala Wai Canal.  The Beachwalk Project was the first project

in the United States involving a double, or compound, curved microtunnel drive.

In addition to selecting FCCC as the general contractor for the

Beachwalk Project, the City also contracted with AECOM to provide construction

management services for the project.  AECOM had an obligation to inspect and

observe portions of the work on the Beachwalk Project.  The City also retained

R.M. Towill as the lead designer and the engineer of record for the project.  Yogi

Kwong Engineers, LLC ("YKE") was hired by R.M. Towill as a sub-consultant to do the microtunneling design work and to prepare the microtunneling specifications for the Beachwalk Project. AECOM also hired YKE as a sub-consultant to perform daily field observation and inspection duties of the microtunneling work.

**B.      Change Order & Selection of Meyer Pipe**

The pipe for the fifth drive of the Beachwalk Project was originally to be manufactured and supplied by the Al-Watani Factory for Fiberglass Company of Kuwait. After the Beachwalk Contract was entered into, however, the City and FCCC decided not to utilize the Al-Watani pipe due to concerns regarding quality and responsiveness. The City and FCCC explored alternatives while the Beachwalk Project was already underway. FCCC offered the City "no cost" change order options to replace the Al-Watani pipe that would not have resulted in an increase in the Beachwalk Contract price; however, these alternatives were rejected by the City and the project designers because the proposed alternatives were unsuitable and did not meet the project specifications. By Written Order dated July 8, 2011, AECOM, on behalf of the City, mandated that FCCC obtain pipe manufactured by Meyer Rohr + Schacht ("Meyer Germany").

USCPS has the North American license to produce Meyer pipe in its Louisiana plant. The Beachwalk Project specifications require, in relevant part,

that the pipe manufacturer selected for the project demonstrate at least five years of

successful pipe manufacturing with over 100,000 linear feet of pipe supplied for

jacking and microtunneling, and at least three successful completions of curved

microtunneling drives of at least 1,000 feet in length each.  While USCPS

possessed the requisite manufacturing experience, inasmuch as the Beachwalk

Project was the first curved drive project in the United States, USCPS did not have

the necessary curved drive experience as required by the project specifications.

Accordingly, at the behest of the City's engineer and construction manager,

USCPS began discussions with Meyer Germany, who had the requisite curved

drive experience to satisfy the City for this project.  Ultimately, it was determined

that Meyer Germany would manufacture the pipe, and USCPS would sell the pipe

to FCCC as a Meyer pipe distributor.

Meyer pipe is a polymer concrete product that is a thick-walled

microtunneling pipe.  It is produced with polymer resin, rock, and sand, and it is

very durable with a high compressive strength and a corrosion resistance that is

superior to concrete pipe.  Polymer concrete pipe, such as Meyer pipe, is

traditionally pressurized only to 35 pounds per square inch ("psi") under its ASTM

standard.  The original Beachwalk Project specifications, however, required that

the installed pipe be tested to a pressure test of 75 psi.  Meyer Germany and

USCPS advised the City and FCCC that the Meyer pipe could not satisfy the

original project specification requirements, but indicated that it was willing to increase the test pressure to 50 psi, but no higher.  Accordingly, use of the Meyer pipe required a modification of the original Beachwalk Project specifications.

Terms of the modifications to the original Beachwalk Project specifications were discussed between the City, FCCC, USCPS, and Meyer Germany.  The original project specifications were revised via change order to allow for the use of the Meyer pipe (hereinafter "Revised Section 406 Specifications").  Specifically, the original specifications were changed to reduce the pipe testing pressure from 75 psi to 50 psi.  Because the Meyer pipe would be replacing the Al-Watani pipe originally selected by FCCC, the Revised Section 406 Specifications instructed FCCC to collaborate with the pipe manufacturer to ensure its product was compatible with FCCC's microtunneling machine and system operation.

## C.    Purchase Order

Even before FCCC entered into a purchase order with USCPS, FCCC was vehemently opposed to using Meyer pipe in the Beachwalk Project.  Donald Bergman, the Chief Estimator for FCCC, expressed various concerns regarding the use of the Meyer pipe to AECOM, and indicated that FCCC wanted no responsibility for the use of the Meyer pipe in the Beachwalk Project.  FCCC requested that the City include in a change order a provision that the City would

6

defend, indemnify, and hold harmless FCCC from any and all claims arising from

FCCC's use of the Meyer pipe on the Beachwalk Project.  FCCC further requested

that it be allowed to disclaim any and all responsibility or warranty concerning the

Meyer pipe, and that FCCC would, under no circumstances, warrant the Meyer

pipe as being adequate or sufficient for use on the Beachwalk Project.  FCCC's

requests were not incorporated into any change order.

   The Purchase Order for the Meyer pipe was largely negotiated

between the City and USCPS.  Following these negotiations, the City informed

USCPS that it needed to continue to negotiate the Purchase Order terms and

conditions with FCCC.  On June 30, 2011, USCPS provided a quote with the

general terms and conditions it required to FCCC.  FCCC provided USCPS with a

proposed purchase order based on FCCC's standard terms.  In response, on

November 23, 2011, USCPS provided FCCC with the terms and conditions that

were negotiated with the City specifically for the Beachwalk Project with the

instruction that they were to be attached to and made a part of the Purchase Order.

FCCC did so and reissued the Purchase Order for signature.

   On November 23, 2011, FCCC and USCPS executed Purchase Order

No. 29001-00013 for the purchase of Meyer pipe and related equipment necessary

for the Beachwalk Project for a purchase price of $3,596,636.98.  The Purchase

Order includes the terms and conditions that were previously negotiated between

USCPS and the City.  USCPS' terms and conditions, which were included in the

Purchase Order, indicate that the Meyer pipe "is fully and completely warranted"

by Meyer Germany and that "Seller [USCPS] is a retailer of Meyer Germany and

as such, all warranties of the manufacturer, Meyer Germany, shall run to Buyer

[FCCC] and Owner [the City] of the pipe."  (Joint Exhibit 23.)  The Purchase

Order expressly states that:

> 8.1     Seller [USCPS] assumes no responsibility for work done or
> expense incurred by the Buyer or others in connection with defective
> pipe or goods sold under this Agreement and repairs or replacement
> due to defective pipe.
>
> 8.2     Seller assumes no liability for any special or consequential
> damages, other than what is expressly stated in the manufacturer's
> warranty.
>
> . . .
>
> 8.5     If the product is found to be defective, the product would be
> replaced under the manufacturer's warranty.

(Id.)  The Purchase Order further requires a first 50% down payment of the

purchase price, a second 25% installment payment upon delivery of the pipe to the

job site, and the remaining third 25% installment payment "to be paid immediately

after pipe is installed and satisfactorily pressure tested (50 psi for one hour)."  (Id.)

Section 1.1 of the Purchase Order's General Terms and Conditions also provides

for liquidated damages of $1,000.00 per calendar day for late delivery, as a credit

from the purchase price.

The Purchase Order contains handwritten changes, allowing USCPS to determine the best shipping option for the products to be delivered according to the delivery schedule. As such, it was USCPS' option to determine whether shipment would be via ocean or airfreight. FCCC did not object or take exception to these handwritten changes.

## D.    Pipe Production

On February 7, 2011, while production of the pipe was supposed to be underway, Meyer Germany notified USCPS that it was preparing to file insolvency proceedings. USCPS had already remitted the initial deposit and payment for the pressure test to Meyer Germany and was not aware that Meyer Germany was having problems or issues that led to its insolvency. USCPS met with Meyer Germany's Insolvency Administrator, who agreed to reopen the Meyer Germany facility, but refused to recognize any of the deposits that were already paid by USCPS. As a result, USCPS had to make the original deposits again at its own expense. USCPS and the Insolvency Administrator agreed to all of the terms that were already within the Purchase Order, including the purchase amount, the limits of liability, and the warranties. USCPS also paid for repairs for the damage the Meyer Germany plant sustained, and replaced all of the plant's raw materials in order to get the facility back into production. USCPS committed to having the general manager from its Louisiana plant on site at the Meyer Germany plant

100% of the time during production of the Beachwalk Project pipe.

On March 1, 2012, USCPS provided AECOM with a status report regarding production of the pipe and USCPS' agreement with the Meyer Germany Insolvency Administrator.  On March 2, 2012, counsel for USCPS confirmed to the City that agreements had been reached with the Meyer Germany Insolvency Administrator, including an agreement to restart the Meyer Germany facility, secure adoption of the Purchase Order, begin pipe production on or before March 12, 2012, and complete pipe production by April 20, 2012.  Meyer Germany had agreed that the Beachwalk Project contract would be fulfilled, including all warranty claims.

**E.     Request for Additional Pipe**

Toward the end of manufacturing, the City directed USCPS to add four additional lengths of pipe to the original order.  In turn, USCPS provided the City with a proposed change order, increasing the quantity of the pipe by four additional lengths of pipe for a price increase of about $69,000.  In conjunction with the change order, USCPS requested to modify the delivery schedule to June 1, 2012.

At the time USCPS provided a cost proposal for the four additional lengths of pipe, the intent was to deliver the pipe by airfreight.  FCCC and the City suggested that instead of airfreight, the pipe could be shipped by ocean in order to

offset the cost of the additional pipe and result in a no cost change order.  Under the terms of the original Purchase Order, it was USCPS' option to airfreight the pipe, which would have allowed for a faster delivery.  In order to get the additional lengths of pipe without any additional cost, the City asked USCPS not to exercise that option.  On May 8, 2012, USCPS submitted the revised no-cost change order to the City and requested that the City provide USCPS with a copy of the revised change order executed by both the City and FCCC.  The no-cost change order provided for an anticipated delivery date of June 1, 2012, but stated that the "actual date of delivery will be used as an amendment" to the change order.  (Joint Exhibit 149.)

The city agreed to the terms of the no-cost change order and informed FCCC of the modification.  USCPS was then directed to proceed on the change order for the four additional lengths of pipe.  USCPS never received an objection to the terms of the no-cost change order or the revised delivery date.

## F.     Delivery of the Pipe

The schedule attached to the Purchase Order anticipated that the pipe would be delivered so that FCCC could commence microtunneling by April 24, 2012.  The anticipated delivery date was based on USCPS receiving the 50% down payment of the Purchase Order price on November 23, 2011.  The down payment to USCPS was delayed by six days, and therefore, the delivery schedule was

revised.  A revised schedule was transmitted to FCCC on December 1, 2011,

indicating that the pipe would be delivered such that FCCC could commence

microtunneling on April 30, 2012.  As discussed above, the request for four

additional lengths of pipe postponed the scheduled delivery to June 1, 2012 or the

"actual date of delivery" in exchange for the no-cost change order.  (See Joint

Exhibit 149.)  The initial shipment of pipe arrived to the job site in Honolulu on

May 17, 2012; the final shipment of pipe arrived in Honolulu on June 15, 2012.

(Joint Exhibit 281.)

## G.      Inspection of the Pipe

Once the pipe arrived and was unloaded in Honolulu, the City had a

team consisting of R.M. Towill, YKE, and AECOM inspect the pipe at FCCC's

Sand Island storage yard.  In response to FCCC's concerns about the Meyer pipe's

conformance with the industrial pressure ASTM specifications and the quality of

pipe as specified in the ASTM for polymer concrete pipe, AECOM investigated

the appropriateness of the pipe for use in the Beachwalk Project by sending a team

to the storage yard to conduct a personal inspection of the pipe.  AECOM issued its

findings to FCCC, which noted that some pipe needed minor repair, but otherwise,

the pipe was suitable for use in the Beachwalk Project.  Certain cosmetic shipping

damage and damage to the gaskets on the pipe were identified and immediately

corrected by USCPS.  Mr. Wanner, the department manager of AECOM, found the

pipe to be of good quality and satisfactory for use in the project.

Upon delivery, FCCC also inspected the pipe. The Purchase Order terms and conditions expressly require FCCC to inspect the pipe upon delivery and notify USCPS if it rejected any of the pipe. The Purchase Order terms and conditions further require FCCC to notify USCPS if the pipe was "defective or not in accordance with [FCCC's] specifications." (Joint Exhibit 23.) Apart from requesting USCPS to fix minor cosmetic shipping damage and damage to some of the pipe gaskets, FCCC did not reject any of the delivered goods, nor did it present any claims against the manufacturer, Meyer Germany, relating to the quality of the pipe. Instead, the Meyer pipe was accepted by FCCC, and FCCC proceeded to install the pipe without rejecting it or calling for USCPS to correct or replace any of the pipe.

Along with AECOM and FCCC personnel, Mr. William Harrel, an on-site field representative of USCPS, also visually inspected the pipe as it arrived. USCPS took care to document how the pipe looked as it was taken out of the shipping containers until the pipe's placement in FCCC's storage yard. USCPS fixed every repair to the pipe that was demanded by either the City or FCCC. None of the pipe was rejected upon its arrival. Following a thorough inspection of the goods by USCPS, AECOM, and FCCC, Mr. Harrel obtained FCCC's signatures on the delivery tickets confirming the delivery of the goods.

In mid-August 2012, after FCCC again raised issues regarding the pipe's conformance to the Beachwalk Project specifications, James Kwong, a representative of YKE, also inspected the pipe. Mr. Kwong opined that the pipe met the project specifications and the applicable ASTM. Mr. Kwong further opined that the pipe was suitable for jacking.

## H.    Commencement of Microtunneling Activities

Microtunneling activities for the fifth drive of the Beachwalk Project commenced on June 29, 2012. In preparation for the commencement of microtunneling activities, an entry shaft and an exit shaft were excavated at the beginning and the end of the proposed pipeline. A hydraulic jack and a microtunneling boring machine ("MTBM") were placed inside the shaft in order to jack the pipe through the pipeline. In the entry shaft, a water-tight seal was created for the MTBM and pipe to pass through. This entry seal was necessary in order to prevent the pipe and the shaft from becoming inundated by ground water during the microtunneling process. According to the project plans, the entry seal was to be created by placing a shorter 3/4" inch rubber seal directly in front of a longer 1/2" inch rubber seal. When the entry ring was set up, however, the placement of these seals was reversed. Around the entry seal are a number of adjustable slide plates. These slide plates, which function to enlarge or reduce the circumference of the entry seal, are adjusted as different circumferences of pipe pass through the

14

seal in order to prevent the rubber entry seals from inverting into the shaft and allowing ground water to seep through into the shaft.

The hydraulic jack located in the shaft pushes the MTBM through the entry seal.  There is a cutting face on the front of the MTBM, and a slurry pump is attached to remove the cut rock and debris from the excavated area so that the pipe has space to be jacked.  The pipe is jacked through the entry seal and follows the MTBM through the pipeline until both the MTBM and the pipe reach their destination, which is the exit shaft at the end of the drive.

On June 29, 2012, FCCC microtunneled the MTBM and steering can, which measured roughly nineteen feet, approximately sixteen feet.  FCCC then installed pipe lengths #1, 2, and 3 on to the loading frame in preparation to jack them through the pipeline.  After completing this work, FCCC notified YKE representative, Ben K. Ahakuelo, that it would not be performing any further microtunneling activities until July 2, 2012.

Upon arriving at the Beachwalk Project job site on July 2, 2012, Mr. Ahakuelo observed that, outside of the presence of the City's consultants and without their knowledge, FCCC had advanced pipe length #1 approximately one to two feet.  FCCC informed Mr. Ahakuelo that the pipe was advanced in order to help stop a leak that had formed near the entrance ring.

FCCC also claimed that the rough leading edge of pipe length #1

15

damaged the 1/2" rubber seal on the entrance ring.  AECOM subsequently opined

that FCCC had not provided any evidence to substantiate the claim that the leading

edge of the first Meyer pipe tore the rubber seal.  Moreover, the City's consultant

team opined that the delivered pipe conformed to the approved shop drawings, and

although FCCC was required to collaborate with USCPS on compatibility of the

Meyer pipe with its microtunneling operation, FCCC had not expressed any

concern about the compatibility of the Meyer pipe and the entrance seal design

during the pipe shop drawing review process.  Instead, AECOM opined that the

entrance ring was leaking prior to the first Meyer pipe passing the seal.

FCCC requested approval to smooth the roughness of the leading

edges of the individual lengths of pipe, and the onsite USCPS representative and

the City's inspector took no exception.  Accordingly, FCCC used an electric

grinder and metal sanding disc to remove all rough edges from the pipe on site.

FCCC then resumed jacking the Meyer pipe.

## I.      The Inundation

At various intervals in the drive, segments of pipe into which

hydraulic jacks and other equipment had been installed were added to the pipe train

in order to provide jacking force to complement the main hydraulic jack.  A

specialized segment of pipe with hydraulic jacking capabilities is known as an

Intermediate Jacking Station ("IJS").  These IJSs have a smaller outer diameter

16

than the standard jacking pipe and are to be used in conjunction with a leading section of pipe that does not contain the usual steel coupling collar and a trailing pipe, both of which are appropriately sized to fit the smaller outer diameter of the IJSs.

FCCC contends that the IJSs did not comply with the Beachwalk Project specifications because they were of a slightly smaller diameter than the regular jacking pipe.  Per the specifications, IJS jacks are to be installed inside a steel or stainless steel casing "fabricated to the same outside diameter as the pipe." The author of the project specifications, James Kwong of YKE, included this specification so that the manufacturer would ensure that the IJS did not protrude a larger diameter than the jacking pipe.  Due to concerns about how an IJS would perform when it is going through a curved drive and whether it has the space available to extend and retract in the curve, multiple requirements were put into the specifications to ensure the manufacturer can produce an appropriate IJS.  Mr. Kwong was aware of the slight recess in the outer diameter of the IJS, and upon initial review of the IJS plan submittals, Mr. Kwong found that the IJSs met and fulfilled the intent of the project specifications.

On July 7, 2012, FCCC reached the point in the fifth drive that required installation of the first IJS.  During the jacking of the pipe, USCPS voiced concerns to the City's inspector about stopping the jacking stroke when the smaller

diameter IJS steel can, or the transition between the IJS steel can and the IJS trailing pipe, passed through the entry seal. This concern was raised because, with the smaller diameter of the IJS in the entry ring, inflow of groundwater from the ring seal may increase. USCPS suggested that FCCC stop the jacking stroke prior to the IJS going through the entry seal and load additional jacking pipe onto the jacking frame so that if inflow increased while the IJS was going through the entry seal, FCCC could continue to push the IJS through the seal without having to wait for new pipe to be loaded. FCCC failed to follow USCPS' suggestions and instead continued to jack the smaller diameter IJS through the entrance seal.

Shortly thereafter, a significant inflow was observed at approximately the time when the steel sleeve of the IJS was jacked past the entrance seal. The FCCC crew inside the shaft inspected the entry seal while the operators on the surface mobilized a four-foot spacer can to be loaded onto the jacking frame. By this time, the water level in the shaft was approximately 4-6 inches deep. With water still flowing, FCCC retracted the jacks and installed the 4-foot spacer can onto the jacking frame to try and plug the entrance seal with the trailing pipe of the IJS. When the spacer can was loaded onto the jacking frame, the water was approximately 12-18 inches deep. Due to the inflow of groundwater into the shaft, the MTBM lost electrical power and stopped functioning.

After the MTBM stopped functioning, FCCC began to salvage any

18

equipment and tools they could, and they proceeded to exit the shaft.  Upon

exiting, the FCCC shaft crew explained to Randy Parrott, an employee of FCCC

with significant microtunneling experience, that the 3/4" rubber seal "had

ballooned towards the inside of the shaft" and that "FCCC should have put 2 more

lengths of pipe onto the jacking frame, so that they could have potentially pushed

the smaller diameter IJS through the gasket and possibly stop the inflow."  (Joint

Exhibit 161.)

From July 7, 2012 through September 6, 2012, after nearly two

months of delay for dewatering of the shaft and repair operations, the shaft was

ready to be put back into service.  A post-inundation investigation by AECOM

concluded that the inundation was a result of a combination of factors, including

the alignment of the MTBM and jacking pipe with the entry seal, and FCCC's

failure to properly adjust the entry ring's slide plates, which caused the seal to

invert into the shaft.  The Court, having analyzed the investigative reports and

considered the testimony of witnesses present during the inundation, finds that

AECOM's investigative report is well-supported and agrees with the findings of

the investigative report as to the cause of the shaft inundation.

The original entry ring seals were eventually removed and replaced

with a single 3/4" rubber seal.  FCCC also changed its means and methods in

installing the remaining IJSs, including carefully adjusting the entry ring slide

plates, in order to prevent another seal from inverting into the shaft.  As a result, the remaining IJSs were installed without any inundation or excessive water flow.

## J.      Pipe Break

For almost two weeks, work on the Beachwalk Project resumed without incident.  On September 15, 2012, however, FCCC mistakenly attempted to install the wrong section of pipe in front of one of the IJSs, which caused the pipe to crack.  The proper leading pipe for the IJS has a special diameter for insertion into the IJS steel can.  These leading lengths of pipe are to be used in conjunction with the IJS instead of a standard jacking pipe, which has a larger diameter.

On September 15, 2012, FCCC lowered pipe length #68 (Serial Number 19) into the shaft and onto the jacking frame.  FCCC then lowered pipe length #69, which was the IJS and trailing pipe, onto the jacking frame.  After the IJS was loaded onto the jacking frame, FCCC attempted to join the IJS to pipe length #68.  Pipe length #68 was a standard jacking pipe, which has a larger diameter, and was not intended to be used as a leading pipe for an IJS.  As FCCC attempted to jack the IJS to connect it to pipe length #68, the City's inspector noted hearing a loud pop coming from the shaft.  Upon examination of pipe length #68, it was determined that the pipe had a circumferential crack approximately one foot from the tail end of the pipe.  Because this pipe length was not intended to be a

20

leading pipe for the IJS, the pipe cracked when FCCC attempted to join it to the IJS.

The need for a special IJS lead pipe was clearly denoted in the Purchase Order.  The description contained in the line item referring to the IJSs reads "Intermediate Jacking Station SS Alloy 2507; **2.0 m Polycrete leading pipe**, 1.66 m loose steel case, & 2.0 m Polycrete trailing pipe[.]"  (Joint Exhibit 23 (emphasis added).)  Moreover, when the IJS cans, IJS leading pipes, and IJS trailing pipes were delivered and accepted by FCCC, the delivery tickets signed by FCCC clearly specify and identify the lengths of pipe, by serial number, that are to be used as leading pipes and trailing pipes.  USCPS also provided notification of the need for special IJS leading and trailing pipes in its project submittals, and provided FCCC with an Installation Plan documenting the proper leading pipe to be installed before each IJS can.

FCCC attempts to defend its selection of the wrong pipe by pointing to an early email from Dave Gellings of USCPS, in which Mr. Gellings responded to a handful of questions posed by FCCC during the negotiation of the Purchase Order.  FCCC questioned Mr. Gellings about whether the "lead pipe" is included in the Purchase Order price.  In response, Mr. Gellings responded that "[a]ny of the standard jacking pipes can be used as the lead pipe; there is no difference in dimension."  (Joint Exhibit 100.)  The question posed to Mr. Gellings did not

reference the IJS or the IJS leading pipe, and therefore, FCCC's reliance on this email to defend its improper use of a standard jacking pipe with the IJS is misplaced.

## K.      Testing of the Finished Pipeline

Despite all of the setbacks encountered in installing the fifth drive of the Beachwalk Project, the installation was complete on or about October 31, 2012. The Revised Section 406 Specifications for the Beachwalk Project provide that the pipe was to be leakage tested "in accordance [with] the requirements of SECTION 214, 'LEAKAGE TESTING'" with the exception that the leakage test pressure was to be reduced to 50 pounds per square inch ("psi").  (Joint Exhibit 17.) Section 214 of the Beachwalk Project specifications sets forth the criteria the pipeline needed to meet in order to pass the leakage test, and provides, in relevant part, that "the maximum drop in pressure in 10 minutes shall not exceed 0.5 psig." (Joint Exhibit 12.)  Section 214 instructs that when leakage exceeds the amount allowed by the Beachwalk Project's standard specifications, "the Contractor at its expense, shall locate the leaks, submit a repair procedure(s) for the Engineer's review, and make the necessary repairs to reduce the leakage to the specified limits, and retest that section of the sewer."  (Id.)

On October 31, 2012, FCCC sent a "Request for Information/Clarification" to AECOM regarding the required leakage test

22

specifications.  FCCC requested that AECOM clarify the criteria for the timing of

the test and the basis for pass/fail.  On November 8, 2012, in response to FCCC's

request for information, AECOM responded that "Contractor shall hydrotest the

pipe at 50 psi for 1 hour with no allowable pressure drop."  (Joint Exhibit 184.)

AECOM subsequently clarified that its November 8, 2012 response to

FCCC's request for information was superseded by the criteria of Specification

Section 214, specifically, regarding the allowable maximum pressure loss rate of

0.5 psi per 10 minutes.  This change was articulated in a revised response to

FCCC's October 31, 2012 request for information, issued by AECOM on

December 16, 2012:

> REVISED RESPONSE (to superseded response dated 11/8/12)
> Contractor shall hydrotest the pipe at 50 psi for 1 hour with allowable
> pressure rate loss of 0.5psi/10 minutes.

(Joint Exhibit 189.)  Thus, AECOM's final response indicated that FCCC shall

hydrotest the pipe at 50 psi for 1 hour with an allowable pressure rate loss of 0.5

psi per 10 minutes.

The pipeline was tested on three different occasions from November

10, 2012 through November 13, 2012.  After the pipeline failed the first three

leakage tests, FCCC submitted a letter to the City requesting direction from the

City on how to proceed.  An afternoon teleconference with the City was held to

review the leakage testing failures.  These discussions concluded by deciding to

concurrently issue a City written order to rent a joint tester to attempt to locate any

leak locations and to schedule another leakage test to be observed by the design

engineer and City representatives.

Thereafter, the pipeline was tested two more times.  On November 15,

2012, the measured pressure loss rate of the fifth leakage test met the 0.5 psi per 10

minute maximum of Specification 214's leakage criteria, and accordingly, the test

was deemed to have passed.  FCCC also conducted a sixth leakage test, without

any notification to the City, which yielded similar results to the fifth leakage test.

Because the pipeline had passed the project specification's required leakage test,

the City declined to issue a written order for a joint tester.

**L.      Acceptance of the Beachwalk Project Pipeline**

On November 27, 2012, after the leakage test was complete and the

pipeline drained, AECOM performed a visual inspection of the pipeline.  The

visual inspection of the interior of the pipe concluded there were no significant

signs of pipe damage or ground water infiltration.  Minor dripping of water was

observed at one of the pipe joints, and a few of the pipe joints showed signs of

saturated joint packer material.  The inspection team recommended that the

dripping/weeping joints be sealed and that all pipe joints be filled in.

On January 3, 2013, Michael Tisdale of AECOM reported to the City

that a final visual pipe inspection occurred on December 21, 2012.  The inspection

reported that one joint dripped every 5-10 minutes and another joint showed no signs of dripping but remained moist around the entire joint circumference, but otherwise, all other joints appeared to be drying up.  AECOM's recommendation to the City stated that "***THE INSTALLED MEYER PIPE MEETS THE SPECIFICATIONS AND MAY BE ACCEPTED AS IS WITHOUT ANY JOINT SEALING.***"  (Joint Exhibit 190 (emphasis in original).)  AECOM indicated that the basis of the recommendation included, in relevant part, that the "the hydrostatic pressure test (exfiltration) results met the limits of [specification] 214."  (Id.)

Following the City's acceptance of the pipe, USCPS did not receive any requests for repairs, replacement, or fixes inside the pipeline, and there are no outstanding requests for repair or replacement of any kind.  Under the terms and conditions of the Purchase Order, the pipe and fittings are "[w]arranted for two (2) years from the date of acceptable in-situ hydrostatic pressure test."  (Joint Exhibit 23.)  Accordingly, the warranty expired on November 15, 2014, two years after the successful leakage test.  To date, there is no evidence of any warranty claim having ever been made against either USCPS or Meyer Germany.

**M.     Relevant Procedural History**

On October 3, 2012, USCPS filed suit for breach of contract against

25

FCCC and Safeco,[1] seeking the second and third installment payments under the

Purchase Order, with interest, as well as attorneys' fees and costs.  (Doc. 1.)

FCCC contends it need not make the second and third payments to USCPS because

(1) the pipe did not meet certain specifications and/or was defective; (2) FCCC is

entitled to liquidated damages because the pipe was delivered late; and (3) FCCC

is entitled to a large offset (or related damages from the City) because of a breach

of contract and negligence by USCPS and/or the City.  (Id.)  As part of its defense,

FCCC filed an Amended Counterclaim against USCPS, joining the City as an

"Additional Counterclaim Defendant."  (Doc. 42.)  The Amended Counterclaim

consists of five causes of action for (1) breach of contract and breach of warranty

against USCPS; (2) a claim against Westchester[2] based on its performance bond to

satisfy USCPS' obligation; (3) negligence against USCPS and the City; (4)

misrepresentation against USCPS; and (5) breach of contract and implied

warranties against the City.  (Doc. 42.)  FCCC also sought consequential damages

stemming from the shaft inundation and the breakage of jacking pipe length #68

[1] Safeco issued a Labor and Material Payment Bond (Surety), as surety, on behalf of FCCC, as principal.  The payment bond requires FCCC to promptly make payment to any claimant for all labor and materials supplied to FCCC for use in the performance of the Beachwalk Project contract.  The performance bond defines "claimant" as any person who has furnished labor or materials to FCCC for the work provided in the contract, and further provides that every claimant who has not been paid amounts due for labor and materials provided may institute an action against FCCC and Safeco on the payment bond.

[2] In order to ensure proper performance of USCPS' obligations under the Beachwalk Project contract, USCPS provided a Performance and Warranty Bond to FCCC, with Westchester acting as surety.  This Bond was never submitted into evidence, but testimony received at trial indicates that the Bond only covered USCPS' responsibilities under the Purchase Order and not the obligations of Meyer Germany.

(Serial Number 19).  (Id.)

      The parties filed five substantive motions.  The Court granted FCCC's Motion for Partial Summary Judgment on the issue of subject matter jurisdiction, determining that the Court has subject matter jurisdiction based upon 28 U.S.C. § 1332, and on September 29, 2014, the Court heard the parties' remaining motions. On October 7, 2014, the Honorable J. Michael Seabright issued an Order granting in part and denying in part the motions for summary judgment or partial summary judgment.  (Doc. 163.)  Judge Seabright concluded that questions of fact preclude summary judgment in favor of either party as to the third payment under the Purchase Order; however, Judge Seabright found that the contract conditions for the second payment had indisputably been satisfied.  (Doc. 163 at 16-23.) Accordingly, Judge Seabright concluded that USCPS was entitled to the second installment payment under the Purchase Order, and awarded USCPS $899,159 for the principal of the second payment, plus interest at a rate of twelve percent per year, or $295.61 per day.  (Id. at 23.)  The Court determined that interest began to accrue on September 1, 2012, which is sixty days after delivery of all parts of the order.  (Id.)  The Court further found that material disputes of fact prevented summary judgment as to the Amended Counterclaim, and therefore denied the remaining motions for summary judgment or partial summary judgment.  (See id. at 23-40.)

27

On May 22, 2015, the parties consented to proceed before United States Magistrate Judge Barry M. Kurren.  Prior to trial, a settlement was reached between FCCC and the City as to all claims against the City.  Trial on the remaining claims commenced on October 19, 2015, and concluded on November 12, 2015.  (Docs. 285, 314.)

## II.     Conclusions of Law

### A.     USCPS' Performance under the Beachwalk Contract

USCPS seeks recovery of the third installment payment, plus interest, that allegedly remains due and owing under the Purchase Order.  FCCC contends that it exercised its right not to pay for the Meyer Pipe due to the imposition of liquidated damages, defects in the pipe, and offsets for damage caused by USCPS and, in its Counterclaim, FCCC seeks damages for (1) USCPS' failure to timely deliver the Meyer pipe, and (2) for defects in the Meyer pipe provided by USCPS.[3] (Doc. 15 at 5.)

To prevail on a claim for breach of contract, a party must prove "(1) the contract at issue; (2) the parties to the contract; (3) whether Plaintiff performed

---

[3] In its Counterclaim, FCCC seeks damages in contract and in tort.  FCCC has no right to seek damages under tort for these claims.  FCCC's "negligence" claim on its face is not a tort claim, but a breach of contract claim.  Moreover, breach of a warranty is a breach of contract claim and not a tort claim.  Where the duty which is claimed to have been breached arises out a contract, breach of that duty is a breach of contract and not a tort.  Francis v. Lee Enters., Inc., 971 P.2d 707, 708 (1999) ("[W]e now hold that Hawai`i law will not allow tort recovery in the absence of conduct that (1) violates a duty that is independently recognized by principles of tort law and (2) transcends the breach of the contract.").  Thus, despite calling its claim one for "negligence", FCCC has only plead, and can only plead under the facts of this case, a breach of contract action.

under the contract; (4) the particular provision of the contract allegedly violated by

Defendants; and (5) when and how Defendants allegedly breached the contract."

Evergreen Eng'g, Inc. v. Green Energy Team LLC, 884 F. Supp. 2d 1049, 1059

(D. Haw. 2012) (citations omitted).  Here, it is uncontested that a contract between

USCPS and FCCC exists.  Instead, the only questions remaining are whether

USCPS performed its obligations under the Purchase Order, and if so, whether

FCCC breached the Purchase Order by failing to remit full payment in accordance

with the Purchase Order terms.

> **1.    USCPS Performed its Obligations under the Purchase Order by Providing Pipe that Conformed to the Beachwalk Project Specifications.**

The contract at issue in this case is a sales contract, namely, for the

purchase of 1,246.4 linear feet of Meyer pipe, alloy couplings, 4 Intermediate

Jacking Stations, and other equipment and materials related to the installation of

the Meyer pipe.  In this matter, USCPS' obligations under the contract are in

dispute.  Namely, the parties dispute whether the Meyer pipe provided by USCPS

conformed to the project specifications in the Purchase Order.

The Purchase Order provides for a sum certain amount to be paid to

USCPS for a stated quantity of materials.  FCCC's Terms and Conditions on Page

2 of the Purchase Order clearly indicate that

> All goods shall be subject to Buyer's right of inspection and rejection.
> If inspection discloses that part of the goods received are defective or

> not in accordance with Buyer's specifications, Buyer shall have the right to cancel all or part of this order.  Defective goods or goods not in accordance with Buyer's specifications will be held for Seller's reasonable instruction.  If Seller's instructions are not given within a reasonable time, Buyer at Seller's risk and expense, may store or sell the goods or return the goods to Seller.  Payment for the goods on this order prior to inspection shall not constitute acceptance thereof and is without prejudice to any and all claims that Buyer may have against Seller.

(Joint Exhibit 23.)  The terms of the Purchase Order further provide "[i]f the product is found to be defective, the product would be replaced under the manufacturer's warranty."  (Id.)  Accordingly, if FCCC determined that the supplied pipe was defective or failed to conform to the Beachwalk Project specifications, FCCC had the right to demand repair or replacement of the pipe under the Meyer Germany manufacturer warranty.  Although FCCC maintains that the Meyer pipe is defective, it failed to reject or otherwise seek further instruction from USCPS, as required by the Purchase Order.

The Hawaii Uniform Commercial Code ("UCC") further supports the conclusion that FCCC's defenses to USCPS's breach of contract claim fail.  The UCC embodies an integrated framework for the regulation of the sale of goods.  Balog v. Ctr. Art Gallery-Hawaii, Inc., 745 F. Supp. 1556, 1562 (D. Haw. 1990).  "Goods," as defined by the Hawaii UCC, includes "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale[.]"  Hawaii Revised Statutes ("HRS") § 490:2-105(1).  Thus,

under the definition provided in Article 2 of the Hawaii UCC, pipe, fittings, and related materials such as those purchased by FCCC from USCPS fall within the Code's definitions of "goods," and therefore, the UCC applies to the instant Purchase Order.  Id.

Generally, under the Hawaii UCC, a buyer of goods may reject the goods if they "fail in any respect to conform to the contract[.]"  HRS § 490:2-601. Assuming the pipe supplied by USCPS was nonconforming, Hawaii Revised Statutes § 490:2-602 requires that a buyer reject the goods "within a reasonable time after their delivery or tender."  Rejection is ineffective unless the buyer "seasonably notifies the seller."  Id.  Hawaii Revised Statutes § 490:2-605 further requires a buyer to "state in connection with rejection a particular defect which is ascertainable by reasonable inspection," otherwise, the buyer will be precluded "from relying on the unstated defect to justify rejection or to establish breach[.]"

Here, USCPS provided and delivered the Meyer pipe to FCCC's Sand Island storage yard.  FCCC had the full opportunity to inspect the pipe, and in fact, did so.  The City, AECOM, and YKE also inspected the pipe.  Although repairs to minor cosmetic shipping damage on a few lengths of pipe and repairs to a handful of gaskets were requested and performed, the City found the Meyer pipe to be in conformance with the Beachwalk Project specifications and expressly approved the Meyer pipe for use in the Beachwalk Project.  FCCC accepted and utilized the pipe

without rejection with full knowledge of the pipe's condition and alleged faults. USCPS did not receive any further demand for repair or modification of the pipe or the gaskets, nor did it receive any demand to remove and/or replace any of the supplied pipe. The City, as owner of the Beachwalk pipeline, fully accepted the installed pipeline. Moreover, the two-year warranty period for the pipe has expired and no warranty claims have been made. Accordingly, under the terms of the Purchase Order and under the Hawaii UCC, FCCC accepted the delivery of the Meyer pipe without rejection, and now, FCCC is precluded from relying on any unstated defect to justify rejection of the pipe or to establish USCPS' breach of the Purchase Order. See HRS § 490:2-605.

In sum, the Court concludes that USCPS has fully performed all of its obligations under the Purchase Order, and FCCC may not raise a claim regarding the conformity of the Meyer pipe to the project specifications or any alleged defect in the pipe as an independent claim or as a defense to payment under the Purchase Order.

**2.     FCCC Breached the Payment Terms of the Purchase Order by Failing to Pay USCPS in accordance with the Purchase Order**

The Purchase Order requires that the third installment payment "be paid immediately after pipe is installed and satisfactorily pressure tested (50 psi for one hour)." (Joint Exhibit 23.) The Purchase Order incorporates the terms of the Revised Section 406 Specifications, which lay out the appropriate standard for

pressure testing the pipeline.  FCCC claims that it is not obligated to make the final

payment under the Purchase Order because the installed pipeline failed to pass the

leakage pressure test required by the project specifications.

Under Hawaii law, a contract must be reviewed in its entirety and the

court's principle objective is to ascertain and effectuate the intent of the parties as

manifested by the entire contract.  Brown v. KFC Nat'l Mgmt. Co., 921 P.2d 146,

160 (Haw. 1996) (citation omitted).  When interpreting a contractual provision, the

court's goal is to determine the intention of the parties.  Pancakes of Hawaii, Inc. v.

Pomare Props. Corp., 944 P.2d 97, 101-02 (Haw. Ct. App. 1997).  Here, FCCC

contends that USCPS agreed to pressure test the pipe at 50 psi pressure for a full

hour without any drop in pressure.  On the other hand, USCPS maintains that the

Beachwalk Project specifications require a leakage test at 50 psi pressure with an

allowable pressure drop of 0.5 psi per 10 minutes.

Revised Section 406 of the project specifications relating to use of the

polymer concrete Meyer pipe, reduces the required test pressure from 75 to 50 psi.

The Revised Section 406 Specifications also require that the leakage pressure test

be completed in accordance with the requirements of Section 214 of the project

specifications.  Section 214 requires, in relevant part, that an allowable pressure

loss of 0.5 psi per 10 minutes is permitted.  A summary of these specifications was

reiterated to FCCC by AECOM in AECOM's revised response to FCCC's request

33

for information, dated December 16, 2012 (hereinafter "Revised Response"),

which instructed FCCC to pressure test the pipeline at "50 psi for 1 hour **with

allowable pressure rate loss of 0.5psi/10 minutes**."  (Joint Exhibit 189 (emphasis

added).)

FCCC attempts to introduce pre-contract communications suggesting

that USCPS agreed to pressure test the pipeline at a standard of 50 psi for one hour

with zero pressure drop; however, "parol evidence regarding the parties' intent as

to the language used in a contract may be considered only when the contract

language is ambiguous."  Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 839 P.2d

10, 31 (Haw. 1992).  The Court finds that the Purchase Order, read in conjunction

with the Revised Section 406 Specifications, is not ambiguous and clearly states

the applicable pressure testing standard.  Accordingly, the Court declines to rely on

pre-contract communications and correspondence that contradict the parties'

written intent.  Boskoff v. Yano, 217 F. Supp. 2d 1077, 1085-86 (D. Haw. 2001)

("[T]he parol evidence rule bars evidence of prior or contemporaneous

negotiations and agreements that contradict the terms of the writing.") (citation and

footnote omitted)).

FCCC also argues that AECOM's Revised Response was an after-the-

fact attempt to alter the pipe's testing requirements, and that the City changed its

pressure testing standards due to conversations with USCPS's official

representative, William Harrel.  However, no evidence supports these positions and the Court concludes they are without merit.

Ultimately, the City, along with its Construction Manager and designers of record, made the determination as to what was required under the project specifications, and they passed and accepted the Beachwalk Project pipeline, in part, on the basis that the pipeline's "hydrostatic pressure test (exfiltration) results met the limits of [Specification] 214."  (Joint Exhibit 190.) The Court concludes that USCPS met all of its obligations under the Purchase Order by supplying pipe that conformed to the Revised Section 406 Specifications for the Beachwalk Project.  USCPS is therefore entitled to the third installment of the contract price together with applicable interest.

### 3.    USCPS' Entitlement to Payment under the Purchase Order

Inasmuch as USCPS fulfilled all of its contractual obligations, FCCC is obligated to pay in accordance with the payment terms of the Purchase Order. See HRS § 490:2-301 ("The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract.").  To date, USCPS has received the first and second principal payments under the Purchase Order, as well as all but three days of interest on the second principal payment. USCPS now seeks the third principal payment, in the amount of $899,159.00, and the applicable interest due on the second and third installment payments.

The Court hereby awards USCPS the full amount of the third installment payment in the amount of $899,159.00.  The Purchase Order provides for interest at the rate of 12% per annum to be assessed on late payments beginning sixty days after the due date.  The final installment payment became due on November 15, 2012, the date the pipeline successfully passed the pressure test. Therefore interest on this amount began to accrue as of January 15, 2013. Accordingly, the Court awards interest on the third payment at a corresponding per diem interest rate ($899,159.00 x 0.12/365, or approximately $295.61 per day). Based on this interest rate, the Court further awards USCPS $341,133.94 in interest on the third payment, reflecting 1,154 days (January 15, 2013 through March 14, 2016) that the third payment remained past due.  The Court also awards USCPS three days of interest remaining on the second payment, in the amount of $886.83.

## B.     FCCC's Counterclaim

In its Amended Counterclaim against USCPS, FCCC alleges that it is entitled to damages as a direct and proximate cause of USCPS' breach of contract. Specifically, at trial, FCCC argued that it is entitled to damages due to (1) the inundation of the excavation shaft, (2) the breakage of Pipe #68 (Serial Number 19), and (3) for USCPS' late delivery under the Purchase Order.  Generally, in an action for damages for breach of contract, only damages that are the "natural and

proximate consequence" of the breach are recoverable.  Amfac, Inc., 839 P.2d at 32 (citation omitted).

### 1. Inundation of the Excavation Shaft

FCCC first claims that it is entitled to damages caused by the inundation because the Meyer pipe and the IJSs provided by USCPS failed to meet the Beachwalk Project specifications, and therefore, contributed to the failure of the entry seal.  As discussed above, the Court concludes that many factors likely contributed to the inundation, such as the failure to properly adjust the entry ring slide plates.  Inasmuch as the Court concludes that the goods supplied by USCPS conformed to the Revised Section 406 Specifications for the Beachwalk Project, FCCC has failed to prove that the Meyer pipe and/or IJSs were a proximate cause of the failure of the entry seal and ultimate inundation of the shaft.  Accordingly, FCCC is not entitled to damages, under any theory, for the inundation of the entrance shaft.

### 2. Breakage of Pipe #68 (Serial Number 19)

FCCC further claims that it is entitled to damages as a result of the pipe break because USCPS did not advise or otherwise demarcate that only certain lengths of pipe were compatible with the IJSs.  FCCC claims that the incorrect use of Pipe #68 as a leading pipe for the IJS caused significant delays and damages, for which USCPS is responsible.

37

The Court concludes USCPS provided sufficient notice, on multiple occasions, to FCCC regarding the different types of pipe and the proper installation of the pipe and IJSs.  FCCC had total control over the storage of the pipe, and moreover, FCCC was solely responsible for the means and methods of installing the pipe.  The Court finds that the sole reason pipe length #68 broke when FCCC attempted to install it as a leading pipe for the IJS is because FCCC selected the wrong pipe.  USCPS, as a seller, has no responsibility for the installation of the pipe, and therefore, FCCC has failed to establish that the Meyer pipe or the IJSs were the proximate cause of the pipe break or that USCPS is responsible for the breakage.  Accordingly, FCCC is not entitled to damages, under any theory, for the breakage of pipe length #68.

### 3.    Liquidated Damages for Late Delivery

Lastly, FCCC claims that it is entitled to $78,000 in liquidated damages due to the late delivery of the Meyer pipe.  The record indicates that all of the Meyer pipe and IJSs were delivered to FCCC by June 15, 2012.  The City's change order, which requested four additional lengths of pipe, effectively amended the final "anticipated" delivery date to June 1, 2012, but reserved the option to further amend the delivery date to "the actual date of delivery."  (Joint Exhibit 149.)  Accordingly, because the change order provides that the delivery schedule may be modified to reflect the "actual date of delivery," the Court finds that

USCPS' delivery was timely.  FCCC, therefore, is not entitled to liquidated

damages for late delivery.

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

\\

### III.    Conclusion

Judgment shall be entered in favor of Plaintiff U.S. Composite Pipe South, LLC, and against Defendant Frank Coluccio Construction Company and Safeco Insurance Company of America, as follows:

(1)    USCPS is entitled to the full amount of the third installment payment under the Purchase Order, in the amount of $899,159.00;

(2)    USCPS is entitled to interest on the third installment payment, calculated at a rate of 12% per annum from January 15, 2013 to March 14, 2016, for a total of 1,154 days, in the amount of $341,133.94;

(3)    USCPS is entitled to the remaining three days' interest owed on the second installment payment, in the amount of $886.83; and

(4)    USCPS and Westchester prevail on all claims raised by FCCC and Safeco in their Amended Counterclaim.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 14, 2016.



  /S/ Barry M. Kurren
Barry M. Kurren
United States Magistrate Judge

U.S. Composite Pipe South, LLC v. Frank Coluccio Construction Company, Inc., et al., Civ. No. 12-00538 BMK, Amended Findings of Fact and Conclusions of Law.